## No. 10,333.

## WILLIAM MYHAN AND WIFE VS. THE LOUISIANA ELECTRIC LIGHT AND POWER COMPANY.

A master who carries on an imminently dangerous undertaking, such as the generation and distribution of electricity, is bound to know the character and extent of the danger, and to notify the same to the servant specially and unequivocally, so as to be clearly understood by him.

Absence of *actual* knowledge is no exculpation. Constructive or obligatory knowledge supplies it. Such knowledge is presumed *juris et de jure* to exist.

The servant is not required to know latent, but only patent defects. Actual knowledge must be established by the master, on whom rests the burden of proof.

The servant has a right to assume superior knowledge in his employer, to rely on his prudence and judgment, and to believe that he will not unnecessarily jeopard his person and life by avoidable risk.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*Geo. L. Bright* for Plaintiffs and Appellants.

*Farrar, Jonas & Kruttschnitt* for Defendant and Appellee.

The opinion of the court was delivered by

BERMUDEZ, C. J. This is an action in damages brought by a father and mother under the provisions of Article R. C. C. 2315 (2294), as amended in 1884, p. 94, No. 71.

They aver substantially, that their minor son, *Edward*, aged about eighteen years, while in the employ of the defendant company, was, on the 8th of August, 1888, killed by the gross negligence and fault of the latter. The amount claimed is $25,000.

The defense is a general denial, and contributory negligence.

The case was tried by a jury who rendered a verdict in favor of the defendant company.

From the judgment thereon, against them, the plaintiffs appeal.

The charge made against the defendants is, that the accident occurred by their gross negligence and fault, which consisted in using wires which were not perfectly insulated, which formed a network on the floor, whereas they should have gone direct from the dynamo to the ceiling, and should have been placed beyond the reach of the employees.

In exoneration the company charges counter, that the young man, instead of approaching the dynamo (No. 35) in the reasonable and proper manner required by the circumstances, did so deliberately from the

front, and deliberately straddled the two current-bearing wires leading from it, one to the ceiling and one to dynamo 50, which was coupled with dynamos 35 and 36 into a series of three; that by the movement thus occasioned, one of the wires touched the interior of the boy's thigh, and the other one the exterior of his buttock, thus making a circuit through his body, the shock of which threw him on the dynamo and thence on the floor, where he lay upon these wires, breaking the circuit in his fall, and receiving the full force of it, which produced instant death.

The stubborn facts of the case are, that Edward Myhan a young man of about eighteen years, was in the employ of the company on the 8th of August, 1888, as night oiler, in the dynamo room of their plant in this city; that during the night of that day, while in the discharge of his duties as oiler, pressing tallow down in the box of a dynamo, he came in contact with one or more wires, on or near the floor, and that he was instantly killed.

There were only two persons present when the accident occurred—the electrician in charge of the dynamo room, and a fellow dynamo oiler.

The former (Crowley) says that from January, 1886, to August 14, 1888, he was employed by the defendant corporation, as chief dynamo man, in their large plant in New Orleans. There were about sixty dynamos in the establishment, arranged on the floor in series of three, each three connected to the plugboard.

He knew Edward Myhan, and had known him for nineteen months previous to his death, which occurred on August 8th, 1888, at about 11 o'clock in the night, in the arc light dynamo department of the defendant corporation. He was in the act of lubricating the dynamo box with tallow. Owing to the arrangement of the wires on the floor, he *had* to stand astride the wires in order to get at the box. While in this position one of his legs came in contact with a wire, and he received the full force of the electric current. At that time the witness was about twenty feet away. His attention was attracted by a dull thud and a flash. On turning around, he saw Myhan on the floor. He had broken the circuit in his fall. He (witness) pulled one of the wires from under his body, raised him in his arms, sent for the Superintendent, who at once came down. Myhan gave one or two gasps thereafter, and then expired.

The witness further states:

Edward Myhan was killed by the fault of the company defendant. The fault was in the arrangement of the dynamo wires. Part of the dynamos on the opposite side were properly arranged. Each dynamo was connected to the plug board by two wires running from the dynamo

to the ceiling direct. On the other side, where Myhan was killed, three dynamos were connected to the plug board by two wires, part of these wires running along the floor of the building, and part of them along the ceiling.

A proper arrangement would have been to connect each dynamo by two wires direct to the plug board, and all the wires passing direct from the dynamos to and along the ceiling to the plug board.

The arragement of the wires on the floor was the cause of the death of Edward Myhan, for, had they been connected from the dynamo to the ceiling, there would have been no danger in standing where Edwa. Myhan received the shock which caused his death.

The company, in the judgment of the witness, was negligent and careless in the arrangement of part of their wires on the floor.

He says that he frequently told the manager of the company, and also the superintendent, who were in charge of the plant, at different times during his services for the company, that there was great danger in leaving the wires on the floor and unprotected.

No notice, says he, was ever taken of the warning, except they would remark they would attend to it by and by, or when they got a new superintendent, or offered some excuse of the kind, until the day after Edward Myhan was killed, when the superintendent and the general manager told him to get carpenters and have nail poles on the dynamo frames, to attach the knobs known as insulators to the poles, and raise the wires from the floor and run them on the insulators, which he did.

Another witness (Sittig), a fellow servant of Myhan, who was also present at the sad occurrence, was heard. He was in the employ of the company when he testified, and had been previously, and was in such employ when Myhan was killed.

Myhan walked to the machine, straddled the wire and put his hand on the cup, and as he did so one wire rested a little above his knee, on the left leg, and the other touched him on the right leg, on the inside, and he put both hands on the cup and he fell with his back on the machine. Crowley ran him (witness) away and told him he would get killed.

He was walking to Myhan, when he was killed, saw him drop; he had his hand on the tallow cup shoving down the tallow. He fell on the dynamo with his back. There were two wires attached to the dynamo, leading to another dynamo near the end. There were three dynamos connected by wires, two leading to each dynamo. The wires were on the floor. Nearly all the dynamos were in this way; three to the circuit. Wires were on the floor, where the men had to walk.

The morning after the killing the witness went home, and when he returned in the afternoon, 6 p. m., he found that some of the wires had been raised with poles overhead.

Two other witnesses (Burns and Bogel), testify in corroboration, except as to the circumstances of the accident. They establish the notices to the manager and superintendent, the dangerous character of the wires, the neglect, after notice, to remove them.

The change of the wires after the accident is shown by another witness—Wilson.

An electrician (Derbin), employed on defendants' plant across the river, says that the wires there are not laid on the floor, but run to the ceiling.

Another electrician (Krapp), of the Edison Company, who had charge of the Edison station in the daytime as dynamo man, says that he is an electrician; has been in the business some four or five years. He has visited the dynamo room in question. Some wires were placed over head and others coming down, connecting one machine, partly laid on the floor and partly brought up again and brought back. There is no doubt the safer way is to lay the wires from the ceiling, as is usual. He would not run them on the floor, but on the ceiling. It is practicable to insulate wires. By passing rubber tubes over them, contact with them will not create a current. Commercial insulated wire will not do. He would not straddle wires, not in that situation.

There is other testimony in the record to show the age, habits, qualities of Edward Myhan, his earnings, his devotion to his parents, their circumstances and need of his assistance, the condition of his body after the accident; and also testimony to show that the notices testified to were not given.

We have been at some pains to state the facts as sworn to by the witnesses, although this was not strictly necessary.

From the proof in the record, it most clearly appears that the young man was in the discharge of his functions as an employee of the company when he came in contact with a charged wire, in consequence of which he was instantly killed.

It is therefore undeniable that the wire or wires which he touched or which touched him were dangerous. Had they not been dangerous, they would not have killed him. He might have received a shock only, even becoming unconscious, but he would not have died from contact therewith.

The company's representatives had been warned several times of the dangerous character and condition of the wires on the floor, of the pro-

priety, at least, if not the necessity of running them up to the ceiling, but the warnings remained unheeded.

The representatives of the company, to whom it is said that the warnings were given, deny that they ever were; but this denial is of a weak character. The affirmative testimony, corroborated as it is, outbalances the negative and justifies the inference that the notices given were unheeded because they were forgotten.

At any rate, it was the duty of the defendant company to have known of the dangerous character and condition of the wires. The knowledge which they ought to have had, the law presumes, *juris et de jure,* they had. Even had the company's representatives sworn that they did not know of the same, such ignorance on their part would not have exculpated them. A superior is presumed to know, and in law knows, that which it is his duty to know, namely: whatever may endanger the person and life of his employee in the discharge of his duties.

In such cases, the superior is bound specially to warn the employee of the nature of the danger, and will not be excused in case of injury unless he does prove that the employe well knew of the danger and, notwithstanding, exposed himself willingly and deliberately to it.

In this case, there is no evidence showing that the company, or any of its officers, ever notified Myhan of the dangerous character of the wires in question, about which he had to move, or that he knew of the same. The burden of positive proof was on the defendant. The great presumption, not to say the certain proof is, that he was totally unaware of the same, for it cannot for one instant be reasonably supposed, that had he known that by coming in contact with the wires they would have stricken him down dead, he would have done so, thereby committing suicide.

It is manifest that, had the wires been laid as is usually done, or even been properly insulated, coming in contact with them would not have, as it did, produced death.

The testimony of the electrician in charge of the dynamo room at the time the accident took place, and who was no longer in the employ of the company when he testified, is clear that Myhan *had* to stand astride the wires to get at the box; but this seems to be denied by the company, who say that Myhan could and ought to have gotten to them in another, which was the proper way.

Their theory on the subject is purely hypothetical. It, in no manner, accords with the established facts and the great presumptions arising from them.

Even if it were otherwise, the most material, the staring fact remains,

that the wires were dangerous; that the company knew them to be such; that they did not specially warn. Myhan, and did not show that he knew that they were of that character.

The company admitted their perilous nature, not only by laying some in the very room and in their plant across the river in the manner in which they ought to have been placed; but also by having the wires put in the proper condition immediately after the accident.

Based on sound reason and shere justice, the law as expounded by jurisprudence is clear, that it is not contributory negligence to engage in a dangerous occupation; Beach Con. Neg. 370, Wood, p. 763; that the risk assumed by the servant is the ordinary hazard, incident to the employment, and this is synonymous with unavoidable accident; Wood, p. 738; that unless the act is necessarily and inevitably dangerous, no negligence can be imputed. Beach on Cont. Neg. .370; Wood, 763; that the servant has a right to rely on the care and trust the superior knowledge, information and judgment of the employer, and to act upon the presumption that the latter would not expose him to unnecessary risk and has taken all necessary precautions; Wood, p. 681, 738, 739, 749, 751, 763; Thompson Neg., p. 975; that an employee is not bound to inquire as to latent, but only patent defects; that he has the right to presume that this inquiry has been made by the employer upon whom the duty devolves, and although the servant may know of the defects, this will not defeat his claim, unless it is shown that he knew that the defects are dangerous. Wharton Negl., sec. 215; Wood 186-9; that the master is liable for subjecting the servant through negligence to greater risks than those which fairly belong to the employment, and the servant need only in order to recover to raise a reasonable presumption of negligence or fault on defendants' part; Wood, 177; Tutrix Faren vs. Sellers, 39 A. 1020.

Considering the facts and the law, we are driven to the conclusion that the company is responsible.

The other question to be considered is the *quantum* of damages to be allowed.

This is not an easy task. in the absence of any rule or precedent by which to be governed.

The testimony shows that the plaintiffs were. in the humble walks of life; that the husband is a policeman on a salary of $50 per month, that he has five children and provides for three of them and for his wife; that Myhan was at the time of his death between eighteen and nineteen years of age with a bright prospect of existence before him; that he was then earning $25 per month, which, as a dutiful son, he employed to minister

unto the wants of his father's family. Of his presence among them and of that assistance they are forever deprived.

The probability is that, as he was a robust young man, attentive to his duties, and kind to his parents, he would have advanced in life and bettered his and their condition. In the course of years he would have accumulated earnings to some reasonable extent, due regard had to his personal wants and necessities.

It is for the deprivation of his presence and support that his father and mother are entitled, under the provisions of the law, to relief.

While we consider that the claim which they have set up for indemnity, at $25,000, is excessive, and admit that it is almost impossible systematically to figure out by *items* what amount may prove to them an adequate relief, we think, under a somewhat instinctive appreciation, considering that, as it is a probability that in the course of time the circumstances of Edward Mylan might have changed, had he lived, an allowance of two thousand dollars would not be unreasonable, and would relieve his parents awhile, to some extent, from the immediate consequences attending the severe injury inflicted on them.

It is therefore ordered and decreed that the verdict of the jury herein, and the judgment of the court thereon, be annulled and set aside, and,

It is now ordered and adjudged, that the plaintiffs, William Mylan and Catherine Crow, his wife, recover from the defendant, the Louisiana Electric Light and Power Company, the sum of two thousand dollars ($2000), with legal interest thereon *per annum*, from the rendition of judgment till paid, and all costs of suit.