## No. 13,479.

MRS. MARY S. DOWNING VS. MORGAN'S LOUISIANA AND TEXAS RAILWAY AND STEAMSHIP COMPANY.

### SYLLABUS.

1.  The parties in charge of a railroad train do not perform their whole duty, under all circumstances, by pursuing the regulation method of giving notice by the ringing of a bell or following out any prescribed mode of giving warning. The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be guaged by what is called for by the circumstances of each case.

2.  Where a working train upon a railroad backs down upon a rarely used side track, towards a point in a village street which its people have for years used for crossing the street, simultaneously with the passing of a freight train through the same street along a parallel track, the trainmen on the working train are bound to know of the probability of there being persons detained at or near the side track or in the vicinity of the crossing by reason of the passing of the train on the main track; of the danger of their having their attention directed to that train; of the great probability of their not hearing or noticing signals which, under ordinary circumstances, might have sufficiently warned persons of the approach of a train on the side track; of the danger of these signals being mistaken, for signals from the train on the main track. They, therefore, should be specially and exceptionally careful to guard against dangers arising from this special situation.

If they back the train down to the crossing, without giving warnings properly called for by this situation, and in so doing run over and kill a man, stand-

ing at or near the crossing whom they were almost forcedly called upon to see if they had been looking in front of them, the railroad company is responsible for damages for their act.

APPEAL from the Twenty-Fourth Judicial District, Parish of St. Mary—*Allen, J.*

*Milling & Sanders* and *John B. Roberts* for Plaintiff, Appellee.

*D. Caffery & Son* for Defendant, Appellant.

The opinion of the court was delivered by NICHOLLS, C. J.

NICHOLLS, C. J. This suit is brought by Mrs. Mary S. Downing in her own right and as tutrix of the minors, issue of her marriage with Isaac E. Downing, deceased.

Her demand is based upon allegations that the defendant company owns and operates a railroad which runs through the parish of St. Mary and through the populous village of Berwick in said parish, and runs through its principal street from east to west, dividing the town into that portion lying north of said railroad, and that portion lying south of said railroad; that the principal business of the town is carried on in that portion lying north of the railroad, and that all persons living south of said railroad in said town are compelled to cross the said railroad when going to the postoffice, to the market, and when going to the business portion of said town to transact their ordinary affairs of business; that the railroad company has established a certain crossing for pedestrians over the said railroad in said town, which was accepted and used by the public in a certain way which shall be shown on the trial hereof, and that the same as thus accepted and used was acquiesced in by the said railroad company.

That on the evening of the 25th day of February, 1899, at from six to seven P. M. o'clock, Isaac E. Downing, the husband of the first named petitioner and the father of the other petitioners, the minor children aforesaid, was returning from that portion of the town lying north of the railroad, where he had been on business, to his home in that portion of the town lying south of the railroad, where he resided with his family; and that while attempting to cross the said railroad at the public crossing and to cross the side tracks used in connection with said railroad, the said Isaac E. Downing was run over by a freight or construction train belonging to the said railroad company, with the result that his body was frightfully torn and mangled; that after suf-

fering intense agony and pain for the period of from four to six hours he was unable to longer bear up against the frightful injuries sustained as aforesaid and succumbed to them and departed this life, leaving a widow and three minor children, petitioners.

That the death of the said Isaac E. Downing was caused by the wanton, gross and criminal negligence of the servants and employees of the said railroad company for this reason, that the employees of the said railroad company backed a freight or construction train, consisting of engine and cars, into the side track on the northern side of the said railroad in said town, without having an employee stationed on the approaching end of said train to give alarm in case of danger, that the train was thus backed into the side track without ringing the bell to give alarm or displaying any alarm signal or lights, and without any notice whatever of the approach of said train being given, and that the train was thus backed down the incline of the side track and approached noiselessly; and that at the time when the said train was being backed into the side track aforesaid, the entire train was running backwards, and all the employees of the said railroad company on the said train, were at or near the engine, which part of the train was at the greatest distance from the said Downing, and that no one was on or near the approaching end of the said train, which end was the nearest to the said Downing, where they should have been, to give alarm of the approach of the said train; and that, at the particular time when, and the place where the said Downing was killed, the said railroad company was running another train, a freight train, over the main line of their track, and the engine of the said train was emitting large quantities of black smoke, which on account of the atmospheric conditions, the blowing of the wind, and the suction created by the rapid approach of the said train, curled above and enveloped the said Isaac E. Downing, to such an extent as to obscure his vision very greatly, all of which prevented the said Isaac E. Downing from crossing over the main line as soon as he reached it, and that exercising due care and precaution in getting out of the way of the train, running on the main line, thereby, as he supposed, avoiding danger and not in any manner contributing to the negligence of the said employees, he was run over by the train which was approaching him along the side track, and of whose approach on account of the wanton and criminal negligence of the employees of said railroad company, as aforesaid, he had no knowledge and no warning.

That this village is thickly settled, and that the public are continually crossing the said railroad at its said crossing, and that it is neces-

sary, customary, and the law required said railroad company, to place an employee on each end of the moving train, that was then being backed in, on the side track, to give alarm in cases of danger. That had the requirements of the law been observed, and these precautions, as aforesaid, taken then, the said Isaac E. Downing would not have lost his life, as aforesaid.

That the said Isaac E. Downing was only fifty-four years of age, was a stout and able bodied man, in perfect health, and that there existed no apparent reason why he should not have lived twenty or twenty-five years longer. That he was an engineer by trade, that he made from twelve hundred to fifteen hundred dollars per annum, from which income he supported his family and educated his children, petitioners; and of which support and maintenance and education they were deprived, and are still deprived, for the reasons that the minors being girl children, of the ages above mentioned, are too young to make a living, by their own efforts, and that their mother is unable to support, maintain and educate them, and at the same time to support and maintain herself.

That by the death of the said husband and father, caused as aforesaid, by the wanton and criminal negligence of the servants and employees of the said railroad company, they have suffered great damage, and have been damaged as follows, to-wit:

That they have been damaged in the sum of one hundred and eighty-five dollars for funeral expenses and doctor's bills.

Mrs. Mary S. Downing shows that she has been damaged in the sum of seven thousand five hundred dollars in the loss of his support and maintenance, and two thousand five hundred dollars in the loss of his society, love, and tender care, and for the great mental suffering caused her by witnessing his death, accompanied as it was, by such pain and suffering on his part.

The minors aforesaid represented herein by their tutrix aforesaid, have been damaged in the sum of twelve thousand dollars in the loss of the support and maintenance of their father, and of the education he could and would have given them, had he not been killed, as aforesaid; they show that they have been damaged further in the loss of the society of their father, and in the loss of his influence, care and protection, and in the great grief and mental anguish experienced by them, in seeing their father in the mangled condition aforesaid, writhing in the agonies of death, in the further sum of three thousand dollars.

Further—that they have been damaged jointly in the further sum of five thousand dollars for the intense pain, anguish and mental agony, suffered by the husband and father aforesaid, such pain and anguish and mental agony having been caused by the injuries sustained, as aforesaid, by the wanton and criminal negligence of the servants and employees of the railroad company aforesaid. They aver amicable demand, without avail. They aver that they are entitled to a trial of the issues herein by a jury.

The prayer of the petition is for service hereof and citation on the Morgan's Louisiana and Texas Railroad and Steamship Company, and on final trial, they pray for judgments for the amounts and items of damage as above set forth, aggregating the sum of thirty thousand one hundred and eighty-five dollars, with five per cent. per annum interest thereon from judicial demand until paid, and for all costs. They further pray for a trial of the issues herein by a jury.

Defendant, after pleading an exception of "no cause of action", subsequently answered. After pleading the general issue it averred that it was solely through the imprudence, negligence and want of ordinary care, on the part of the deceased, that the accident, which is alleged to have occasioned his death, occurred, and further, that if there was negligence on the part of its employees and officers, which was denied, that same was not the proximate cause of said accident, but that the negligence of deceased, contributing thereto, was the proximate cause thereof, and that, but for such negligence, on the part of deceased, the accident would not have occurred.

In view of the premises defendant prayed that plaintiff's demand be rejected and her suit dismissed at her cost, and for general and equitable relief.

The issues were tried by a jury which returned a verdict of ten thousand dollars against the defendant. The court rendered judgment in conformity with the verdict and defendant appealed.

## OPINION.

### I.

It is conceded that Isaac Downing, the husband of one of the plaintiffs and father of the others, was injured by being run over by a train of cars operated by the defendant or parties for whose acts it is responsible, and that from and by reason of that injury he came to his

death. The disputed points are the facts and circumstances under which the injury was received. The defendant claims that at the moment of the injury Downing was a trespasser upon its right of way, or at best a licensee; that he was guilty of contributory negligence in standing at the place he did when defendant's working train was passing down the side track on the way to its proposed local station for the night; that employees were all in their proper positions at the time; and did everything that was necessary and proper to be done by them as the train approached the crossing, near which the deceased was struck; that the bell was rung and the whistle sounded, and the train was moving slowly, and that nothing but Downing's own imprudence, gross inattention, and want of care, gave rise to the accident.

The injury occurred a little after six o'clock on Saturday, the twenty-fifth of February, 1899, on one of the streets of the village of Berwick City. Downing was taken from under the third car of the train (which was moving), one of his legs was severed from his body and he was otherwise severely hurt. He died the same night at ten o'clock, having been unconscious except for a very short time after having been taken to his home.

Berwick City is an unincorporated village of about one thousand inhabitants. It lies on the side of Berwick Bay, furthest from New Orleans, and opposite to the town of Morgan City. The defendant company's railroad, after passing through Morgan City, crosses Berwick Bay by a railroad bridge and passes through, on its way to Pattersonville, Franklin, New Iberia, and Lafayette, one of the streets of the village referred to. Prior to the building of the bridge, transportation across the bay was by means of a ferry. The lands adjacent to the ferry, on the Berwick City side, were level, and the tracks of the company on that side approached the ferry landing from Pattersonville or Franklin on a descending grade. When the bridge was built, the situation having changed, a new raised track had to be constructed by the side of the other, and cars passing through Berwick City to the bridge from Franklin, on their way to New Orleans, had to pass through the village to the bridge upon an ascending grade. The old track was not torn up, but was permitted to remain to be used as a side track for switching purposes, or for parking cars and depositing rails and ties down on the level ground next to the old ferry as occasion might require.

The two tracks are almost parallel on the village street, one, however, being considerably higher than the other and the two together taking

up almost in its entirety the width of the street. Under what circumstances and conditions the defendant company came to occupy this street with their tracks does not appear. There is no evidence of any expropriation proceedings having ever been taken out, and whether the right of way through the village is through ownership of the fee—under a servitude acquired for a consideration or simply by acquiescence or gratuitous permission—we do not know. We are not informed under whom and from whom the defendant holds or claims, nor from what time their claims or rights date relatively to the right of passage by the public over and through the said street. The new or present main track, as parties stand upon it, looking towards Patterson or Franklin, is the left of the old track—now side track. The latter is referred to throughout as the north track, and the main line as the south track. The population on the north and south sides of these tracks is almost equally divided.

So far as the evidence in the case goes, the street has been a thoroughfare for the villagers from the time of the creation of the village. It is just as likely that the general public was already in possession of a right of way through and over this village street when the defendant's tracks were placed thereon, as, that this right of passage by the public should have arisen subsequently to the occupancy of the street by the defendant's road.

We cannot assume that the village was only built after the construction of the road.

On the afternoon of the twenty-fifth of February, 1899, a working train of the defendant company, which was working at or near Pattersonville, left that place to be placed in position for the night at Berwick City; the sleeping cars and cooking cars of the workmen having been left there from about the eleventh of February. The engine of the train was at the Franklin end of the train and it, therefore, backed its way down to Berwick. At about half a mile before reaching Berwick it stopped at the point where the side track, which we have referred to, made its extreme westerly connection with the main line. The switch was opened and the train backed in until the whole of it had passed on to the siding and the engine had reached a point from twenty to thirty feet from the main line. There it stopped to enable the brakeman to close the switch. The train then backed again until it reached a point on the side track, at which certain arrangements had been made, so as to enable trains on that switch to pass again, if desired, on to the main line, or to continue down the side track on to what is called the

"spur track" into the streets at Berwick. On this particular occasion the working train passed down into the village on the spur track.

At or near the store of one Henry Jacob, a little frame building on the *north side* of the street, and facing the side track, there was another switch by means of which cars on the siding at that point could be made to be run down to the old ferry landing on one of three or four tracks.

The portion of the side track between the first westernly switch (the switch nearest to Franklin) and the next switch to the east (that by means of which a train on the siding could be made to pass again upon the main track), is generally spoken of in the testimony as the *"side track,"* while the portion between the second switch and Jacob's store is referred to as the "spur track," and we shall so distinguish them.

It appears that the market and the principal stores and places of business are on the north side of the street on which these tracks are constructed, and that the people of Berwick have constantly, for many years, crossed the tracks going from one side of the village to the other. They could not well do otherwise. We have stated that the tracks occupied almost entirely the width of the street. We should add that in making the roadways and embankments thereof, the defendant had taken the earth from the street itself, leaving ditches on the right and left of the same. At different intervals these ditches are crossed by bridges to enable parties to pass over on to the tracks and from one side of the street to the other. One of these bridges is in front of the residence of a Mrs. Thompson, who lives upon the north side of the street, facing the side track, and nearer to Franklin or Pattersonville than Jacob's store. Along the front lines of the properties, between Jacob's store and Mrs. Thompson's and between these front lines and the ditch, there is a banquette or sidewalk which, under the evidence, is not at all in a good condition, and sometimes impassable. The slope of the embankment of the spur track, between Jacob's and Mrs. Thompson's, seems to constitute the outer line of the ditch, which is not so wide at Jacob's store as it is nearer to Mrs. Thompson's. Between the ends of the ties of the spur track at Jacob's store and the side of the ditch at that point and for some fifty or sixty feet or more west towards Mrs. Thompson's, there is sufficient space for a person to walk between the ties and the ditch, but at that point or distance the space becomes so narrowed by the widening of the ditch that its outer edge runs practically up to the ends of the ties, and a person leaving Jacob's store and walking by the side and on the outer edge of the ties, is forced at this

point, in order to proceed further in that direction, to reach the crossing in front of Mrs. Thompson's, to pass upon and along the spur track itself. The evidence shows that while it is feasible to walk alongside the ties up to what may be called "this turning off" point, yet in point of fact the spur track itself, from in front of Jacob's up to the Thompson crossing, is the usual route followed, though there is sufficient walking along the edge to have caused a well defined and visible path.

On the afternoon in question, Isaac Downing, who lived on the south side of the street, went to the market on the north side to obtain his family supplies. Having done so, he started homewards. Going to Jacob's store he crossed to the side of the spur track, there turned and went westward in the direction of the *Thompson crossing,* near which, but on the opposite side of the street, his residence was. It is a disputed point whether, when he turned at the track, he immediately went on and walked upon it until he was struck, or whether he walked along the path by the side of the track, up to the "turning off" point and then went inside of the rails of the spur track, or upon the edge of the ties.

Be this as it may, he did not reach the usual point of crossing at Mrs. Thompson's, for a freight train passing on the main track, on its way to New Orleans, seems to have caused him to stop and await its passing. While so standing, the working train backed down through the side track, into the spur track, struck and ran over him and injured him, as before stated. This occurred a little after six o'clock in the afternoon. Defendant does not pretend that there was any light upon the end of the caboose as the train backed down upon the spur track, nor that any signal was given to the engineer to stop, either by the conductor or the brakeman, until after Downing was struck. Defendant's witnesses, the conductor, the engineer, the fireman and the two brakemen upon the train, all admit that they did not know of Downing's presence at or near the track, and testify that they did not see him until after the accident. Just so soon as it occurred, the conductor signalled the engineer who stopped the train at once as promptly, after receiving notice, as we think he could have done. There is no blame to be attached to the engineer's conduct on the occasion.

We have, therefore, to look to the conduct of Downing himself and to that of the conductor and the brakemen. Downing is dead and never recovered sufficiently to give his own version as to how the accident occurred. We think it well established that he was taken entirely by surprise by the near approach of the car; one or two witnesses say that

he became aware of its approach just prior to being struck, and made a motion to escape, but we think this very doubtful in view of statements of other witnesses. We do not think that the question as to whether there should have been a light at the rear end of the caboose, as the train backed down, plays any part in the decision of the case.

In the first place we think it was not sufficiently dark, when the accident occurred, to have called for the placing of a light at that hour upon the end of the car, even if it had been upon the main track, as objects were distinctly visible at the time; and, in the next place, the train upon the siding was to be stopped in a few moments for the night, and that particular method of giving a warning was then scarcely required. The only witnesses who speak of Downing's position at the time of the accident are those of the plaintiffs, who place him standing, at the time, on the edge of the ties outside of the rail, on the north side of the spur track (the rail next to Jacob's store and the Thompson residence), and facing the main track, his attention evidently directed to the passing freight train. It is easily understood how Downing may not have seen the working train or known of its approach, but it is difficult to understand how neither the conductor, who declares that he was in the side door of the caboose, at the right hand, and looking in the direction towards which the train was backing, nor Houghton, the brakeman, who declares that he was on the top of the caboose, left hand side, and also looking in the direction towards which the train was moving, should have failed to see Downing.

There was certainly enough light to have seen him, and the space within which he was bound to have been almost forcedly brought him within the line of vision of one or the other of these persons. If either had declared that he had seen him somewhere in the neighborhood of the track, though not upon it, and that his position, when struck, must have been the result of a sudden unanticipated movement of Downing from the side, we could understand the situation, but that neither Casey nor Houghton should have seen him at all, can be accounted for only by the fact that one or the other, or both, were not looking, at the time, in the proper direction. Neither Casey nor Houghton attempt to explain why they did not see Downing. Plaintiffs' counsel assert that they did not see for the very simple reason that they were not in their proper places, and not in a position to see, but we do not think this position maintainable. We think that Casey and Houghton were each, at the time of the accident, in the places which they respectively testified to having been at at that time, but the mere fact of their having

been at those places, would amount to nothing unless they performed the duties for which they were placed there. There were strong reasons calling for exceptional vigilance on their part. The spur track below Berwick had been used, it is true, as a camping ground for the working train of the defendant since the 11th of February, a portion of the cars being left there all day and all night from that date, while another portion would go out in the morning, return at noon, and again go out to return at dark, but, none the less, it had been for a long while seldom used, so seldom as to have caused its presence to have ceased to give rise to any suspicion of probable danger.

## II.

The track had been used both for a crossing and for walking along in order to reach the crossing, so generally and for so long a period, that the fact must necessarily have come to the knowledge of the company, and it could not ignore that fact in the handling and management of its trains. On this particular afternoon, the working train backed down the spur track simultaneously with the passing along opposite to it, and upon the main track, of a heavy freight train, the ringing of whose bell, as it passed along, together with the inevitable noise resulting from its moving, were bound to some extent, at least, to conceal the approach of another train on the other line of track. Of this fact the conductor of the working train must certainly have been aware and he should have been specially and exceptionally careful to guard against the danger arising from this special situation.

He must have known of the likelihood of there being persons detained at and in the vicinity of the crossings by reason of the passing of the train upon the main track; of the danger of their having their attention diverted to that train; of the great probability of their not having noticed or heard signals, which, under ordinary circumstances, might have sufficiently warned persons of an approaching train on another line, or of these signals being mistaken for those of the freight train. He must have known that the end of his train, when it commenced moving back through the second switch, was almost within striking distance of any one at or near the crossing, and that their opportunity for discovering the approaching cars and avoiding danger, was very little, and both he and Houghton should have given their fixed and undivided attention to what was just behind their train.

They could not possibly have done this. It is more than probable that,

forgetting how much might happen in a few seconds of time, the attention of one or the other was directed for a little while to the freight train, and that short period of inattention or carelessness is responsible for the accident.

It will not do to say that the bell was constantly rung from the time of entering the first switch; that this was sufficient, and that if Downing did not hear it, it was simply his misfortune and that of his family; that the trainmen had nothing to do with the train on the main line. It is a mistake to suppose that by pursuing the regulation method of giving notice by the ringing of a bell, or following out any particular prescribed mode of giving warnings, parties in charge of a railroad train perform their whole duty under every contingency or on all occasions. The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be gauged by what is called for by the special circumstances of each case. It is very true that the conductor and brakeman of the working train were under no responsibility for the handling of the train upon the main line, but it does not follow from this that the management of their own train was to be totally independent of what other trains might be doing, or where they might be, particularly those belonging to the same company.

A number of witnesses testify that the fireman of the engine on the spur track rang his bell constantly; a number of others deny that fact. Casey, the conductor, says he heard it from where he was standing in the side door of the caboose, while Houghton, the brakeman who was on the top of the caboose, testified that he did not hear it. We think he did ring it, but that it was probably confounded with the ringing of that of the freight train, or that its noise was drowned and confused by other noises. The whistle of the train was not blown after it entered upon the spur track, or, indeed, after it entered into the switch proper. We think it would have been a proper precautionary measure to have blown it just before or as the train passed on to the spur track. The mere presence of a train of cars above on the switch proper was not calculated to give notice that the train would come upon the spur track. There were trains upon that switch constantly passing on and off the main track, but the going down of a train upon the spur track was exceptional.

The most effective method of avoiding this particular accident would have been for Casey, from the side of the caboose, or Houghton, from the top, to have called to Downing from their respective places. He

might have been forced, for safety, to have jumped into the ditch, but he would have been saved, by so doing, from bodily injury.

Defendants say it was as much Downing's duty to have seen the approaching train, and to have gotten out of the way, as it was the duty of the trainmen to have seen him and avoided the accident. They argue the case from the standpoint of Downing's having been a trespasser on their track, and at best a licensee, and assert that they were under no obligation to keep a lookout for any one at the place he chanced to be. It has, indeed, been sometimes said that trainmen are under no obligation to keep a lookout for trespassers, but that statement is entirely too broad. Parties in charge of a railroad train are under an obligation to keep a lookout all the time, though they are not held to as rigid a lookout for trespassers, where they would not reasonably be expected to be found, as they are where their presence would not only be a possibility, but a probability. Though the contractual relations between carrier and passenger and the relations between employer and employees affect, to some extent, the question of the care which trainmen must exercise, it cannot be contended that they are absolved from all duty to trespassers prior to the time when they are actually discovered at or near the tracks in a position of peril. Our Code, Article 666, declares that "the law imposes upon proprietors various obligations towards one another independent of all agreements." On the same principle are imposed upon railroad corporations various obligations to the general public, independently of all agreements or special relations.

In Nave vs. A. G. S. R. R. Co., 95 Ala. 294( referred to in Provost vs. Railroad Co., 52 A. 1902), the Supreme Court of Alabama declared that "to run a train at a high rate of speed and without signals of approach where trainmen have reason to believe that there are persons in exposed positions on the track, as over an unguarded crossing in a populous district of a city, or where the public are wont to pass on the track with such frequency and numbers, facts known to those in charge of the train, those in charge will be held to a knowledge of the probable consequences of maintaining great speed, without warnings, so as to impute to them reckless indifference in respect thereto, and render their employees liable for injuries therefrom, notwithstanding there was negligence on the part of the injured and no fault on the part of the servants, after seeing the danger. The doctrine is not based on the idea that they ought sooner to have observed the danger, however, but on the ground that they knew of its existence, of the presence of people

in positions of peril as a matter of fact, without seeing them at all in the particular instance."

It would not be necessary to bring about the liability that the Alabama Court here refers to, that the producing cause of injury should be the running of a train at a high rate of speed, coupled with an utter absence of signals. Though a train might have been running slowly, and though there may have been signals given of some kind, the railroad company should not be relieved of responsibility, under the circumstances, if the signals were manifestly insufficient to have met the requirements of a proper warning; if the cars, even running at a slow rate, would, for want of a proper warning, have inevitably run over and injured the persons at the crossing. The defendant argues this case from the standpoint of Downing having been a trespasser or, at best, a licensee, upon their property. We are not prepared, under the evidence in this case, to say that this argument is justified by the facts, and that Downing, at the time of the accident, occupied *quoad* the defendant the position of either a trespasser or a licensee.

As matters stand, and as we view them, we are authorized to dispose of the issues before us fro mthe standpoint of equality of rights and reciprocity of obligations, modified and controlled by the course which each party was called upon to pursue under the exact conditions of the particular case. In this instance the necessity of rapid transit, an element frequently referred to as calling for subordination in the use of streets or highways by individuals, to their use by railroads, was not present, for the accident took place upon a rarely used side track by the action of a working train which was going into quarters for the night, the work of the day having been completed. It could well have been held up after its entrance through the first switch until the train upon the main line, with its attendant confusing noises, had passed by. It is contended that Downing was not justified in "standing" or "loitering" upon either the track or the crossing, and that he should have "stopped, looked and listened," before passing upon or crossing the track. There is nothing in the record to show that he may not have done this, and the distance between the point where the train passed from the side track to the spur track up to the point where the accident occurred, was too short, under the circumstances of this case, to have caused a failure to look again while the train was moving over that space, to create a presumption of negligence. It is true that streets and crossings have been declared no proper places for stopping

and loitering, but the stopping of Downing was the result of the blocking of his way by one of defendant's passing trains.

We do not think that the fact that the accident occurred some feet short of a crossing makes any material difference in the situation, from what it would have been had it taken place directly at the crossing. Downing was as plainly visible at the point where he was standing, and injury to him was as easy of avoidance as if he had been directly at the crossing. We do not think the particular place at which he was standing, relatively to the crossing, was the proximate cause of the injury in this case. He would, unquestionably, have been killed had he been at the crossing. The defendant cannot complain of his having to cross upon the track to reach the crossing from the path along the side of it, as it had cut off further extension to the path by the widening of the ditch at that point, and bringing its side next to the rails up to the outer edge of the ties.

We coincide with the jury in opinion, and the district judge, that the injury to Downing and his resulting death, were due to the fault of the defendant and this conclusion carries with it its legal liability to repair the damage resulting from it (Civil Code, 2315).

We have, therefore, to consider what that damage is and to whom it is due. The article of the Code, which we have just cited, declares that "every act whatever of man that causes damage to another, obliges him by whose fault it happened, to repair it," and that "the right of this action shall survive in case of death in favor of the minor children and widow of the deceased, or either of them."

In this case the deceased lived for several hours and has left surviving him a widow and four minor children (daughters).

In Castello vs. Caffery Refinery, 48 Ann. 330, we had occasion to refer to this surviving action as one *"ex delicto."* In Article 1934 of the Civil Code it is declared that "although the general rule is that damages are the amount of the loss the creditor has sustained, or the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss or the privation of pecuniary gain to the party; where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality, or taste, or some conveniences or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for

a work of some of the fine arts, are objects and examples of this rule. In the assessment of damages under this rule, as well as in cases of offences, *quasi*-offences, and *quasi*-contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages (under the above rules fixed by preceding clauses of the article) as will fully indemnify the creditor whenever the contract has been broken by the fault, negligence, fraud, or bad faith of the debtor."

Though, under the provisions of this article, exact indemnity is not to be. made the test of damages due for an offence or *quasi*-offences and much has to be left to the discretion of the judge or the jury, they should not act arbitrarily in this matter. We think it, therefore, proper that the parties should be permitted to introduce testimony as to "compensatory" damages, not to the end of fixing conclusively thereby the measure of damages, but affording some guide in the ascertainment of what would be a reasonable and judicious exercise of the right of assessment (61 Pacific Rep. 609).

The deceased was a man between fifty-two and fifty-four years of age, exemplary in his habits and in perfect health. He was energetic, laborious and prudent, a skilled mechanic earning from twelve to fifteen hundred dollars a year; he was a kind and affectionate husband and father, supplying his wife and children to the full extent of his ability with everything needful for their comfort and good. No tables of mortality were introduced in evidence, but witnesses declared that he could reasonably have looked forward to "reaching a ripe old age." The wife had and still has some little property of her own, but not near enough to support either herself or the family.

We are of the opinion that the verdict of the jury and the judgment therein rendered are correct, except as to the amount of the damages awarded to the plaintiffs. We are of the opinion that that amount is too large, and that it should be reduced to six thousand five hundred dollars.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be and the same is amended by reducing the amount for which judgment is rendered in favor of plaintiffs against defendants, from ten thousand dollars to six thousand five hundred dollars, and that as so amended the judgment be affirmed.

Costs of appeal to be paid by appellees.

Rehearing refused.