(38 South. 859.)

No. 15,296.

HARVEY v. LOUISIANA WESTERN R. CO.

(Jan. 30, 1905. On Rehearing, June 20, 1905.)

RAILROADS—INJURY TO EXPRESS AGENT NEAR TRACK—EVIDENCE—SPEED OF TRAIN —CARE AT STATIONS.

1. Personal injury was the cause of action.

2. The questions are mainly of facts.

3. Whether the rate of speed was unusual or usual on the night of the accident, the extent of the obstruction in a passageway, the place of the accident at the depot, the light at the depot, whether sufficient or not, are questions bearing upon the issues.

4. The testimony is conflicting. The jury observed the witnesses; saw them while testifying. They must have been familiar with the depot and depot grounds. Some weight must be given to their verdict.

5. The railroad company owed it to the employés of the express company to furnish a reasonably safe passageway from the depot to the train.

6. A railroad train approaching its depot in a large municipality should moderate its speed.

7. Witnesses who notice that the speed is unusually fast on approaching a depot are not discredited by the fact that they are not familiar with the management of a railroad under way.

Monroe, J., dissenting.

(Syllabus by the Court.)

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Conrad De Baillon, Judge.

Action by Emmie Harvey against the Louisiana Western Railroad Company. Judgment for plaintiff, and defendant appeals. Modified.

Laurent Dupré and Denègre & Blair (Farrar, Jonas & Kruttschnitt, of counsel), for appellant. Medlenka & Taylor (Carleton Hunt, of counsel), for appellee.

BREAUX, C. J. This suit was instituted by plaintiff to recover damages in the sum of $10,000, arising from an accident in which her husband, W. T. Harvey, lost his life. Originally plaintiff brought suit for $25,000 damages. The jury rendered a verdict for the amount claimed. A remittitur of $15,000 was entered. The judge of the district court after the remittitur granted a new trial. On the second trial a verdict was returned for plaintiff for the sum of $10,000, amount asked by plaintiff. On the second trial the judge rendered a judgment based on the jury's verdict.

From this judgment defendant prosecutes this appeal.

The deceased husband of plaintiff was a night expressman employed by the Wells-Fargo Express Company on the night of February 9, 1903, at Crowley.

There is no reason to infer that he (deceased) was lacking in experience as an expressman, nor that he was not familiar with the location, the track, or the movements of the railroad. On meeting the train with his truck, he was required by the duty incumbent upon him to deliver his packages or to receive the freight consigned to his company from the train and put it on his truck. On the night in question he left his home about the usual hour, and went to the depot to meet the train coming from New Orleans and going west. The train was late. As the train was nearing the depot, he pulled his truck alongside the track and continued to walk, at the same time pulling the truck, in the westerly direction in order to arrive in time at the place where his packages would be received or where he would receive freight. This truck measured four feet wide by ten feet in length. While thus going on his way, he pulled the truck onto the track, or so near that it was struck by the front part of the engine, or pilot beam of the train, and thrown some distance; and while thus hurled it (the truck) struck him a hard blow on the right side of the body, crushed in his ribs, and fractured his legs, which resulted in his death a few hours afterward. The truck was shattered to pieces. In his suffering condition after the accident he was, we infer, unable to give any account of the accident, and gave none.

Plaintiff charges in her petition that the adjacent grounds to the depot and along the track—that is, between its track and depot—were dug out, the surface lowered, and that it remained open for a number of weeks, thus reducing the width of the passageway to a dangerous degree.

The second charge of plaintiff is that one of defendant's employés placed a truck loaded with baggage at the end of the obstruction, and left insufficient space between the said obstruction and the railroad company's track for the late expressman to pass with his truck, and that in attempting to pass he could not avoid pulling the truck to and on the track. The insufficiency of light at and about the depot is another cause of plaintiff's charges.

The speed of the train is adverted upon as another cause of the accident.

An ordinance of the municipality of Crowley limits the speed to six miles an hour. The engineer, it is urged by the plaintiff, did not have the train in hand. It is said by witnesses for plaintiff that it ran a number of feet beyond the station before the engineer made the usual stop. Plaintiff also seeks to account for the accident by the statement that on the night of the accident the train passed the water tank without stopping to fill its water tank, and that it came into the depot ground sooner than it otherwise would have done. These are the grounds which, according to plaintiff, constitute the fault and negligence of defendant. Defendant company, on the other hand, says that the deplorable accident was not due to fault or negligence on its part, and that the late Harvey was heedless and negligent in pulling his truck, as he did, too near the track, on which he must have known that the train behind him was coming and was about to pass.

The locality of the accident requires our special attention. The following sets forth features in that direction which do not seem to be disputed by either plaintiff or defendant; such as that the depot is on the north side of the track, and extends from Parkerson avenue east to Avenue F west; that the main line of the railroad passes in front; that there is a platform at about 40 feet from the east end of the depot, and at right angles to this platform that there is a small platform for unloading; that there were two

trucks on the passage—one stationary, left there by some person unknown, and the other pulled by the deceased at the moment of the accident.

The closely contested case leaves only a few uncontested facts regarding the locality and the appliances provided for the workmen.

The disputed facts are the rate of speed at which the train was running; whether the bells were struck and the usual warning given; the place at which the late expressman met with the accident; the light, or rather want of light; the obstruction at the place of the accident; the excavation in front of the depot, which the company had made; the rate of speed of the train after it came within the corporate limits; passageway over which the deceased was pulling his truck; the stopping place of the train, and the place to which it ran on the fatal night to Harvey; and the duties of a night expressman.

With reference to the warning, there is testimony of witnesses for defendant that at the whistling post the steam was shut off and the usual signal given; the speed was reduced, and that the train came into Crowley at the usual rate of speed; that the engine and train were under perfect control; that it stopped at the usual place—that is, about the west end of the freight depot. The train had a bright light—acetylene light. The engineer testified that he saw a man pulling a truck right beside the track at a distance of about 70 feet ahead of the engine, near the freight depot, and about 50 feet west of the negro waiting room. He (the expressman) was on the passageway between the track and the depot.

Morgan, a witness for defendant, employé of the Wells-Fargo Express Company, testified that the late express man was "right alongside of the railroad track, by the baggage truck"; that is, when the train was coming in.

This truck, we are informed by other testimony, was there loaded for train No. 8, going east, which was late.

Another of defendant's witnesses (Haley) testified that the stationary truck to which we have before referred as being on the passageway near the unloading platform was about 12 or 14 feet from Harvey when he was picked up. We take it that this was west of the unloading platform, where there was no room for Harvey to pass with a loaded truck standing on the passageway without pulling to and on the railroad track. These were the "obstructions" which, according to a deal of testimony, caused the deceased to veer to his left and onto the track in order to avoid it (the stationary truck or loaded truck), and pass beyond to the place where the train usually stopped. Whether this veering was intentional is not known. It is only known that there were not the usual number of lights, that there was an obstruction on the way.

There were three station lights, and it seems beyond question that one of them was out (burnt out) at the time. The width of the passageway is controverted. We infer that it was not sufficiently wide for two trucks to pass each other in front of the unloading platform, which projected out from the depot to the track, to which we have before referred.

The testimony informs us that the late expressman was seen a few moments prior to the accident going west with his truck toward the other truck—the latter loaded with trunks—which had been left on the passageway. The loaded truck was on the right side of the passageway at the end of the gang plank which projected out from the platform before mentioned. The latter—the loaded truck—had been placed there by the ticket agent or the porter.

With reference to the duty of the expressmen who handle the trucks we are not led to infer that there is any hard and fast

.rule. It was their duty to have the trucks at the station; but sometimes they were not pushed to or pulled to the train before it ,stopped, nor do passenger trains always stop at the same place at Crowley, it appears.

The rate of speed, the place at which the train stopped on the night in question, present issues bearing upon the case.

With reference to the "depression" of the land along the passageway, between it and the depot, there can be no special cause of complaint, for it was not intended to be any part of the passage. ¨This depression does not seem to particularly bear upon the issues. When the deceased came to the obstruction, there was no reason for him to turn and .follow along the depression, for it was low, and, we understand, uneven. He could only .follow the passageway, which at a particular place, because of "obstruction," the loaded and offending truck was not wide enough. We infer that when he came to this place he changed his course. Just then the train came and hurled truck and truckman at some distance. It was a hard blow, which is hardly reconcilable with the thought that the train was running at the usual rate of speed when approaching one of the stops on the way. We let this pass for the moment, and take as correct for the time being the fact to which defendant's witnesses have testified that the train had moderated its speed to the point that it was running at the usual rate of speed when approaching a station at which it is to stop; that is, about six miles an hour. At that rate of speed the conductor of the train testified that it could be stopped within 20 or 30 feet.

Another witness for the defense said that it would take about 300 feet. This was perhaps said inadvertently. The conductor, we have just stated, testified that such a train running at that speed can be stopped within 20 or 30 feet.

We are informed by the engineer's testimony that the truck was seen ahead about 75 feet as it was pulled along the track. This engineer of the train testified:

"I saw a man pulling a truck right before the track," and "I saw that it was away from the track, and that there was no necessity of my paying any attention to it at all," and "I did not think that he was going to come on the track." "I never paid any attention to their moving their truck about."

He confined his attention to "dangers between the rails."

The collision between the truck and the train, though it must have been violent, it seems was not felt by him (the engineer). The fireman knew nothing of it. The engineer made no mention of it to him. The testimony of the engineer is not clear upon this point. The distance is not stated even approximately at which the deceased was from the head of the car. We will not pursue this particular point any further. The theory it suggests does not bring conviction to our minds to any extent rendering it proper in our view to write a judgment setting aside the verdict and decree of the district court.

Accidents will arise. They are inevitable. Sometimes they arise from a moment's inattention or unconcern of one in charge.

We are not impressed by the view that the whole of the "last chance" in this case was exhausted. The testimony does not justify such an inference. Our court has, in exceptional cases, had occasion to give effect to the doctrine of the "last chance." McClanahan v. V. S. & P. Ry. Co., 111 La. 782, 35 South. 902; Downing v. Railway & S. Co., 104 La. 517, 29 South. 207.

A close watch and hasty action, it seems to us, might have resulted in avoiding the accident. It does not appear that there should have been an earlier stop than the one made. The car was permitted to run along until it arrived at the usual stopping place.

The deceased was neither a trespasser nor a licensee. He was trudging along for a livelihood hours before day at his usual place of work.

Ordinarily the workman who is industri-

ous and fond of his work—we infer from the evidence that the deceased was of that number—becomes accustomed to the place at which he works, to the implements, tools, and surroundings. It becomes almost instinct with him. He follows the beaten path almost instinctively while at work. If anything be displaced, or a change is made, he takes some little time to adapt himself. For that reason we take it the rule imposes the duty upon the master to furnish a reasonably safe place to those who work for him. A safe place should be provided. There should have been no obstruction on the track. Faren v. Sellers & Co., 39 La. Ann. 1019, 1020, 3 South. 363, 4 Am. St. Rep. 256; Helm, Tutrix, v. E. & J. O'Rourke, 46 La. Ann. 185, 186, 15 South. 400; Mattise v. Ice Co., 46 La. Ann. 1539, 16 South. 400, 49 Am. St. Rep. 356; Myhan v. Electric Co., 41 La. Ann. 964, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436; Carter v. Fred W. Dubach Lumber Co., 113 La. 239, 36 South. 952.

Here there was a less number of lights than usual. There was "obstruction" in the passageway, which the deceased sought to avoid by passing to one side, and which was the more dangerous because there was less light than usual and because of the rate of speed of the train. A number of witnesses were heard in regard to the rate of speed. If we were to take the number of witnesses, it would appear that of the thirteen who testified the larger number by one testified for the defendant, and stated that the speed was the usual rate.

The weight of the testimony is not to be determined by a majority. This, it is proper we should state, is not the position of learned counsel for defendant. They have not claimed that any verdict is due because of the number of witnesses. It remains as a fact that both the train going east and the train going west were late on the night in question. We understand that the desire to make up for lost time is sometimes an incentive to keep up the rate of speed. This may be considered as corroborative of plaintiff's witnesses.

If this train came in at a fast rate of speed, as testified to by all the witnesses for the plaintiff—so fast that it passed and went beyond the usual stopping place—then may it not well be that the truckman was taken by surprise; that he had conceived the idea that he could pass, not suspecting that the train would come in any faster than usual; particularly may he have been taken by surprise if the train on the night failed to stop, as it usually did, at the water tank to take water?

We have not found ground to set aside the verdict and judgment.

The following is the chapter of contributory causes which have arrested our attention: The failure to exhaust the last chance; the lack of the usual light; the obstruction in the passageway, which deceased attempted to pass when he was overtaken; the rapid rate of speed of the train (and the danger in consequence). There is testimony that the rate was over six miles an hour.

The jury heard the witnesses, saw them, observed their manner of testifying. They were acquainted with the locality. The depot was not far from them. They found for plaintiff. We cannot say that they have erred, for it is not evident that they have.

As relates to the amount of damage: The deceased was 29 years of age. His wages were $40 a month. He was married, and had three children, aged, respectively, 7½, 5½, and 4 years. He lived about eight hours after the accident.

The law and the evidence being in favor of plaintiff, the verdict of the jury and judgment of the court are affirmed to the amount of $7,500, with legal interest from the 5th day of May, 1904. The verdict and judgment for a larger amount than the above is rejected, and to that extent the judgment appealed from is amended.

PROVOSTY, J., not having heard the argument, takes no part.

## On Rehearing.

NICHOLLS, J. Defendant contends that, in view of the notice given of the approach of the west-bound train to Crowley by the whistle of the locomotive sounded at the whistling post about a mile to the east of the city, it was the duty of Harvey to have started earlier than he did to take his truck to the west of the baggage truck of the company, which was already standing between the south rail of the track and the platform which ran out from the depot to the track; either that, or that his movements should have been more rapid than they were. It maintains that, had this been done, the accident would not have occurred, as he would have reached the objective point he was aiming for in safety. We think these propositions were beyond question true, but in testing his conduct we must ascertain what the conditions usually existing were when trains came up to the depot from the east, and what they were on the night of the accident. The evidence shows that there is a water tank a very short distance above the city, at which trains from the east usually stopped to take on water before entering Crowley; that when they moved forward they did so with only such speed as would be given from the movement of the train resulting from its moving over the short space between the tank and the depot with the momentum given to it in view of an immediate stop. On the night in question the train was 20 or 25 minutes late, and was evidently trying to make up time, as, instead of stopping at the tank as usual, with the delay and loss of speed incidental to the stop at the tank, it passed directly to the depot. The length of time taken by the train to go from the whistling post to the depot was less than usual, while the speed at which it came in was greater. Harvey's course was evidently guided by what would have happened had matters taken their usual course. Had they in fact taken such course, Harvey, we think, would have reached the point he was aiming at without risk or danger. Under the conditions actually existing, his action was imprudent, and, as it turned out, attended with fatal results to him. The testimony is conflicting as to the speed at which the train came to the depot, but we think the jury had reasonable ground for reaching the conclusion that it was unusual. Outside of the testimony actually introduced, the probabilities are in support of that conclusion. The evidence goes to show that the depot grounds were not sufficiently lighted by the company, as they should have been. Had they been lighted, the engineer would have seen Harvey's position by the side of the track clearly and distinctly. As matters were, he saw indistinctly what was at the depot. We give substantial extracts from the testimony of Williams, the engineer of the train, given on cross-examination, leaving out most of the questions. Witness in going into Crowley did not see Mr. Harvey. He saw some one. He did not know whether it was Harvey or not. He saw a man pulling a truck right beside the track. He was about 50 or 60 feet ahead of the engine at or near the freight depot. He was pulling a truck. He was right alongside of the track. Witness saw that it was away from the track, and that there was no necessity of his paying any attention to it at all. It was away from the track when he saw it. In the testimony given on the first trial of the case he said something about the truck, but he did not see the man pulling it. He said he saw the truck about the length of a car and a half before the engine—something in the neighborhood of 75 feet.

Leaving his former testimony, the witness, coming back to the night of the accident, said he saw on the right of way a little platform extending out, but nothing else. He

did not see a truck there loaded with baggage. He did not know how far Mr. Harvey was from this platform when he first saw him. He was looking down the track, and not paying much attention to those off the track. The pilot beam projected about two feet from each side of the rail. The train was moving at the rate of six or eight miles an hour—something like that. Asked why he did not stop the train, he answered he did not think he was going to come on the track. Witness never paid any attention to the baggagemen and expressmen moving their trucks about. Asked whether he was not always on the lookout for danger at the stations, he answered, "Between all stations I look out for danger between the rails." Referring to the testimony given by him on the first trial, he said that he had stated "that he saw a truck slowing up near the track, but could not see the man. He was in the dark." Referring (on the second trial) to the air brakes on the train, he said the brake was what is known as a "low-speed brake." After reducing the air pressure to 15 or 20 pounds you could stop no quicker. The air brake would carry 70 pounds. It carried that that night. Seventy pounds would, of course, stop quicker than 50 or 20. When he saw Mr. Harvey he had nearly all the brakes on that he could. He could have put on two pounds more, he thought. Asked the question with reference to that train at the rate of six miles an hour and all air applied, "could you have stopped your train within a distance of fifteen or twenty feet?" he answered, "Yes, he could, and would have done it had he thought he was going to get on the track." He could have stopped sooner by using the lever—the reverse lever. The effect of that was to reverse the steam and stop the train. He did not reverse the engine that night. It was too quick. He was on the track too quick. The train must have struck the rear end of the truck. Harvey was not on the track when struck. He was too close to the track to pass by without striking him. Witness had notice of the city ordinance requiring the speed of the train to be reduced to six or eight miles an hour. He got his information from his time card. On the first trial of the case witness testified that he first saw the truck about 10 feet west of the platform, about the length of a car and a half ahead. Asked, "What did you do then?" he answered, "I stopped." Asked, "Did you apply the emergency brake?" he answered, "No, sir." Asked, "You made no effort whatever to stop that train?" he answered, "My train was under control, and I stopped at the usual place, and the emergency brake could stop no quicker."

It is evident from the testimony of the engineer that he did not consider his duty of keeping a lookout for danger ahead extended beyond the ground inside of the rails. That he was not called upon to take into consideration the condition of things existing just outside of the rails as to objects within two feet of the rails, which were bound to be struck by the pilot beam. In this view of his duty the engineer was greatly mistaken. That portion of the ground ahead was subjected to his scrutiny as much as that within the rails, particularly at such a danger point as the immediate surrounding of the depot of a city, where conditions are likely to exist at any time which would lead up to death and injury. It is evident from his own testimony that the engineer, after seeing the truck as close as it was to the tracks, took no steps whatever to check the train, but left matters to run precisely the same course which they were running before. as if he had not seen it. He seems to be of opinion that, having blown the whistle at the whistling post, and slackened the speed which the train had at that point, he had no further duty to perform, and no concern as to what might happen thereafter, unless as to some object which might actually come inside of the rails.

We need scarcely say there was great misconception by the engineer as to what his position called for. It is claimed on his behalf that he was not called on to anticipate that the company would place one of its baggage trucks between the projecting platform and the rails, and that at the precise moment the train was approaching an expressman would attempt to pass between the baggage truck and the rail. It may well be that that particular state of facts might not have been anticipated, but he was bound to anticipate that at such points some dangerous conditions might exist calling for special immediate action, and he should have been prepared to meet it to the full extent of the instrumentalities within his power, governed as to this by no conventional rule. The engineer admits himself that the instrumentalities within his control were not exhausted. Besides other instrumentalities, a single tap on the bell at the opportune moment might have saved Harvey's life.

In the event that the court should hold that Harvey was guilty of contributory negligence in moving with his truck at the time and place he did, counsel of plaintiff invoke an application of the doctrine "the last clear chance," and refer the court to the case of Bogan and Wife v. Carolina Central Railroad, 129 N. C. 154, 39 S. E. 808, reported in the 55th Vol. Lawyers' Annotated Reports, page 418; to Inland and Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270, and Grand Trunk R. R. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485; to Kramer v. New Orleans City and Lake R. R. Co., 51 La. Ann. 1689, 26 South. 411; McGuire v. Vicksburg, Shreveport & Pacific R. R. Co., 46 La. Ann. 1543, 16 South. 457; Lampkin v. McCormick, 105 La. 418, 29 South. 952, 83 Am. St. Rep. 245; Downing v. Morgan's La. & Texas R. R. Co., 104 La. 508, 29 South. 207; McClanahan v. V. S. & P. Ry. Co., 111 La. 782, 35 South. 902; Becker v. L. & N. R. Co. (Ky.) 61 S.

W. 997, 53 L. R. A. 267, 96 Am. St. Rep. 459; Shear. & Redf. Neg. vol. 2, §§ 483, 484.

Two juries by their verdicts found this claim of the plaintiff to be well founded, and this court has, on an independent examination of the facts, found likewise. We have on this rehearing examined the testimony, and we do not think we would be warranted in undoing what has been done already. On the contrary, we think the jury (in the exercise of the right and authority conferred on it) could well have found a state of facts which would have justified their verdict. We should therefore leave undisturbed the judgment heretofore pronounced by us in this case, and it is hereby so ordered and decreed.

MONROE, J. I dissent.