No. 14,045.

LETTIE THOMPSON, WIDOW OF ELLIS SINGLETERRY, TUTRIX, FOR THE USE ETC., vs. NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

### SYLLABUS.

1. There was great danger of accident in carrying on the work of reconstruction of the overhead electric lines and the railway track.
2. It was not made satisfactorily to appear that plaintiff's husband, a laborer employed by defendant, was guilty of contributory negligence.

Thompson, Tutrix, vs. Railroad Company.

3. Whatever special patrol or warning party there may have been is it not shown that it sought to warn defendant of the danger by which he was surrounded.
4. The risk was not one assumed by the employes.

A PPEAL from the Civil District Court, Parish of Orleans—
Theard, J.

*Oliver B. & Samuel Samsum*, for Plaintiff, Appellee.

*Dart & Kernan (Purnell M. Milner*, of Counsel), for Defendant, Appellant.

The opinion of the court was delivered by

BREAUX, J.  Plaintiff, tutrix of her minor children, sues to recover damages against defendant for the death of their father caused by an electric shock received by him while at work for the defendant company.

At the date of the accident, defendant was rebuilding its system of railway.  The work consisted in reconstruction of both the overhead electric lines and the railway track.  They were at the time also reconstructing the feeder system of electricity, taking out the smaller wires and putting in larger ones.  The company had a night working gang and one during the day.  The cars were operated as usual, but under much greater difficulties.  Several hundred men were employed in breaking and digging up the soil, putting down new rails and were doing corresponding new work overhead along the track.          ,

The company employed experienced electrical engineers who had charge of the work which altogether extended as far up as Carrollton from the point of beginning which was at Lee's circle.  Their materials, we are informed by the record, were the best to be found and the subordinates had had long experience, and great care had been given to select only competent employees.

The company, through its representatives, says that all needful prudence was observed and warning given.  None the less the accident occurred which resulted in the death of plaintiff's husband.

In accordance with orders, plaintiff's husband and a number of other men were at work carrying heavy rails weighing over four thousand pounds each from the street to the center of the neutral ground; they had carried one rail to where they had been directed to

place it, near the iron trolly pole. The accident happened while they were carrying the second rail.

Defendant's contention is that in depositing it they swung violently against this trolly pole and it was then that the heavy glass insulator by which the feed wire was supported and around which the tie wire was fastened was broken and thereby the iron screw was exposed and it cut the wire and left it rubbing against the iron pin, charging the iron pole and inflicting a shock which was felt by the twenty men holding the rail, killing plaintiff's husband. This is one of the decisive issues of the case, plaintiff's contention being that the rail was not violently thrown against the trolly pole, while defendant insists that it was.

We have examined the testimony as carefully as we could, bearing this contention in mind. In view of the great weight this crew was handling, it is possible that they brought the rail in contact with the trolly pole with some force, but of this we have no positive testimony. On the contrary, the testimony discloses that the men carried the rail as directed. It was then that the shock was received. In the presence of the positive testimony sustaining the contention of plaintiff that nothing unusual was done in laying the rail near the pole, we do not think that we would be justified in adopting the theory that the violence of the contact between the rail and the pole caused the glass insulator to break and disinsulate the wire. That view is not supported (but the reverse) by direct testimony of witnesses who were holding the rail just at the moment of the shock and just as they were placing it close to the trolly pole.

One of the contentions for the defendant is that if the insulator had been broken two days prior to the accident, as averred by plaintiff, then that there would have been an alarm given at the power house by a machine referred to by witnesses as a circuit breaker.

The testimony, while positive enough regarding the purpose of this machine in matter of giving alarm, did not satisfy us that it was so absolutely reliable that it must be taken as conclusive that the insulator was broken by a violent blow in laying down the rail, and that it was not broken at any time prior, for the reason that it (the machine) had not given any alarm. The reliability of the instrument was not sufficiently shown to render it evident that the glass insulator was not broken before the accident. We do not recall, after a

careful reading of the testimony, that even at the moment of the accident when defendants say the violent blow was struck, the alarm from this machine was heard by anyone. According to defendant's theory it would, at least, at that time, have been heard if it invariably gives the alarm. After having carefully considered the evidence, we infer that the report it gives depends upon the intensity of the "grounding" of the pole and that a pole may be dangerously charged with electricity without invariably giving an alarm signal loud enough to call the attention of those not near.

One of the electricians in charge of the works, with clearness and precision, said that he learned from the foreman in charge of the line of construction that the insulation covering the feed wire had been parted to just what degree he did not recall, evidently due to its dropping from the pole on the arm and then that it was further parted by rubbing due to the curve in the feed wire at the point where the insulator was. Upon his arrival at the place of the accident he found that the feed wire had been lifted from the iron cross-arm. and was resting on a wooden board placed on top of the cross-arm. His conclusion was that a current not exceeding five hundred volts was transmitted from this feed wire through the weakened insulation to the cross-arm and thence to the pole and that it was thus the electric shock was received.

The liability of iron poles to become charged, we are informed by this witness, in the construction of an electric railroad property such as was under way in this instance, is not at all remote and it is not an uncommon thing in such work for a pole to become slightly grounded, or, in other words, charged.

Another of the electrical engineers, who was equally as direct in his testimony, says that in his judgment the iron pole was charged with electric current, transmitted from the abraded feed wire, which became abraded due to no neglect of any kind on the part of the company, but to a force of circumstances which are liable to occur in such work.

All agree that there was great danger of accident in handling heavy rails; from the falling of poles; danger of wires coming in contact with "grounded" poles, and forming circuits; and other risks attending the reconstruction of an electric railway. This being the case, it imposed a high degree of responsibility on the company in order, by every reasonable means, to prevent injury to its employees.

We are led to believe, from the facts, that there was a live wire

uninsulated, or defectively insulated, resting on the pole in question. Companies are liable for accidents due to defective insulation, or to failure to take proper "precautions to prevent conductors of electricity from coming in contact with its trolley wires." Am. & Eng. Enc. of Law, Vol. 10, p. 889, 2nd Ed.

There were officers, subordinates, and laborers, employed. The officers, it is shown, gave themselves some concern to warn all the employees. But this warning did not reach all the employees. Whatever patrol there may have been against danger does not seem to have warned the working gang of which deceased was a member; the inspector, at this particular place, does not seem to have discovered that the covering of the wire had worn off, and that the insulation was imperfect.

In a similar case this court held the defendant liable. Myhan vs. La. Electric Light Co., 41 Ann. 964.

In another jurisdiction it was decided that it is the duty of the master to warn his servants of dangers in machinery. Galv. vs. Garrett, 73 Texas, 262. This, it occurs to us, is specially requisite when the danger is as great as it was in this case. We have specifically referred to the testimony showing that those in charge expressed some apprehension lest accident, in view of the danger, would occur. This cannot have the effect of releasing the company from all responsibility.

In the case before us, although the plan of operations may have been good enough, and the officers mindful of their trust, it does not relieve the company from indebtedness for injury due to some oversight or negligence resulting in a fatal accident to one of a gang of twenty laborers.

Our learned brother of the District Court saw and heard the witnesses. To his opinion, regarding its weight, must be given due importance. After hearing these witnesses, he came to the conclusion that the testimony sustained a claim for damages. We have not found that he has erred. He fixed the amount of damages at a sum we do not think we should increase.

We, therefore, deny plaintiff's application here for an increase, and have concluded to affirm the judgment.

The law and the evidence being with plaintiff, the judgment of the District Court is affirmed.

Rehearing refused.