No. 12,725.

JOSEPH D. JAMES, FOR USE PAUL ANTHONY CALVIT JAMES, VS. RAPIDES LUMBER COMPANY, LIMITED.

ON APPLICATION FOR REHEARING.

It is the duty of the master to give warning of danger to an inexperienced employee, not informed of the danger, who is placed in charge of dangerous machinery.

The facts found by the verdict are sustained by a presumption of correctness, until error is shown.

It is the negligence of the foreman of a steam saw-mill to call on one of its employees suddenly, and on the spur of the moment, to take a position in the mill that is dangerous, without giving him any instructions or explanation whatever, of the movements of the machinery, or the risk and hazard of the employment, with which the employee had neither a previous knowledge or acquaintance. For such negligence, the proprietor is responsible to the servant.

APPEAL from the Tenth Judicial District Court for the Parish of Rapides. *Hunter, J.*

*H. H. White* for Plaintiff, Appellee.

*Howe, Spencer & Cocke* and *R. P. Hunter* for Defendant, Appellant.

Argued and submitted February 10, 1898.
Opinion handed down March 7, 1898.
Rehearing refused April 18, 1898.

The opinion of the court was delivered by

WATKINS, J. This action was instituted by the plaintiff for four thousand dollars damages for the use of his minor son, Paul Anthony Calvit James, against the defendant company for the injuries he suffered for the deprivation and loss of his left hand, which was cut off at the wrist by a diminutive saw in its mill, through the fault and negligence of the company, its officers and employées.

The defendant answered at length and in detail, and also filed a plea of no cause of action, which was considered with the merits.

The cause was tried by a jury, who found a verdict for the plaintiff in the sum of three thousand seven hundred and fifty dollars; and after an unsuccessful effort to obtain a new trial the defendant prayed for and obtained this appeal.

The plaintiff's demand is for three thousand dollars general damages and for one thousand dollars insurance.

He represents that on the 17th of September, 1897, his minor son was working in the employment of the defendant company as watchman and lumber grader, and that while so employed he was ordered to go to work at one of their machines known as an edger; and that upon going to work at the edger, and upon taking hold of the first piece of lumber from it, his left hand was cut off at the wrist by the edger.

He shows that his son was a minor; that the edger is an exceedingly dangerous machine, and that it was situated in an exceedingly dangerous position. That its appliances were not properly protected so as to prevent the happening of accidents; and that, consequently, only skilled and well-trained workmen should be employed to work there. That at the time his son was assigned to duty at the edger the defendant well knew that he was a minor; that he was not a skilled workman; that he knew nothing about working at the edger, and that he had been theretofore employed at work which was not dangerous. That, notwithstanding all that, the defendant's foreman called upon him suddenly, upon the spur of the moment at a time when the mill was in full operation, to assume that part of danger; and that his son, being called upon to make a sudden and unexpected election whether he would undertake the employment, or by declining it run the risk of a discharge, he chose the former—not having been warned by the foreman of the defendant, or any officer of the company, of the danger there was of working at the edger; nor given

James vs. Lumber Company, Ltd.

any instructions as to the character of the work he was expected to perform, or of the means of guarding against accident.

He shows that when he was employed by the defendant the amount of seventy-five cents per month was exacted from his son by the company, and deducted from his wages, as premium on accident insurance, the policy representing which the company had obtained from the Union Casualty and Surety Company, of St. Louis, Mo.

He shows that no policy was issued to him, and that none was applied for in his name; but that same was applied for by, and was issued in favor of, and made payable to the defendant company.

That notwithstanding the aforesaid monthly exactions of insurance premiums from his son, as an employee, the conditions of the insurance were never explained to him. That since the accident he has made demand of the defendant first and afterward of the insurance company for a statement of the insurance, but was refused information by both of them—the latter only admitting that it carried an accident policy *indemnifying the defendant company against loss or damage they might sustain, or had to pay their employees.*

It is on this score that the plaintiff claims one thousand dollars; and it was at this demand that the defendant's plea of no cause of action was leveled.

In this court the plaintiff and appellee filed an answer to the appeal and requested an amendment of the judgment so as to award him one thousand dollars insurance money against the defendant.

This demand, as we understand it, is, that his son is entitled to the sum of one thousand dollars of the insurance money which is ultimately recoverable from the accident insurance company on the policies of insurance which were issued payable to the defendant company, because he had paid the premiums which bought the insurance.

Or in other words, the insurance premiums having been exacted from its employee and used to keep in force a policy guaranteeing the defendant against loss, or damage it may have to pay said employee on account of an accident, the amount of said insurance when realized by the defendant from the insurance company should be paid over to his son in diminution of the full amount of the damages due him.

That is to say, the insurance policies should inure to the *benefit* of an employee who has kept up the premiums which give life to the policy.

The defendant for answer pleads a general denial, and then admits that defendant was injured in the hand by its mill, but avers "that if in any event respondent was liable for damages, which is expressly denied  *  *  *  then respondent avers that the damages claimed.  *  .  *  *  are out of all proportion to the injury done," etc.

It denies any knowledge of the minority of the plaintiff's son, and affirms that from his size and appearance it was believed that he was a grown man several years past majority.

It avers that he came to the mill several months prior to the accident, sought employment and was employed in several capacities, especially as night watchman, and had received his wages in his own name without disclosing his minority.

That after having been employed as a night watchman for several months, the plaintiff's son sought work at the mill, " expressing to the defendant's foreman and superintendent, his capacity to fill, and his desire to fill, any place to which he might be assigned," etc.; and that at his request " he was put to work in the mill at day work, and had worked in the mill for several days in different capacities in plain view of the machine and saw, where he was finally hurt in his hand."

"That on the morning of the accident (the plaintiff's son) was by the foreman of the mill hands requested to fill the place of one of the men who was sick and absent, and whose duty and work were to take plank which had been sawed and planed off a table and platform, to lay them on a machine about eight or ten feet away from the saws (which were) so placed (as) to cut off square both ends of the plank; and which machine was operated by steam power and worked rollers and dogs, so that after the plank was laid on the rollers, it was not necessary for a workman to follow the planks, or to remove from his safe and remote position with reference to the saws.

"It avers that the machine was first class of its kind, and in perfect working order; and that it was so placed, and all of its appliances were so arranged as to furnish the best possible protection to the men engaged in operating it.

"That it required no particular skill, or knowledge to safely and properly perform the labor required of the workman at the machine; that any man who could lift, with other men at the other end, one or several planks and lay them on the rollers, could perform the work required of the plaintiff's son.

" That instead of maintaining the position he was told to take, at a perfectly safe distance from the saw which was intended to cut off the ends of the planks, at the end of which he was put at work, as soon as he had put the plank on the rollers he immediately began to follow them up the incline and in the direction of the saw. That the other workmen warned him by calling to him in a loud voice, but he continued to follow the planks until they had reached the saw, which was in plain view of him; and that he reached his hand forward until it touched the saw and was injured by it."

Under the foregoing statement of facts, the answer charges the plaintiff's son with contributory negligence which exonerates the company from liability for damages, and its averment is that he voluntarily and knowingly assumed all of the risks which were incident to his employment, and for that additional reason there can be no recovery.

In the answer there is no mention made of the plaintiff's demand for the payment of insurance money; consequently it must rest on the general issue.

From the evidence it appears that young James was assigned to work at the *trimmer*, which is a small circular saw situated near the edger, a much larger machine.

From the parol evidence, as well as the photographs which were taken of the *locus in quo* while the machinery was in operation, it appears that there is visible to the eye not more than one-fourth of the saw, which is, apparently, of but a few inches in diameter.

As stating defendant's view very succinctly, we make the following quotation from counsel's brief, viz.:

" That on the day of the accident the plaintiff's son was requested to take the place at the trimmer of the regular workman who was sick and temporarily absent. That the duties required *of* him were to take the planks, after they had been sawed, from a table or platform and lay them on the apron of the trimmer several feet from the saws, and were taken thence to the saws by machinery for the purpose of having their ends squared—so that it was not necessary for the workman to follow up the planks or to move from his safe position, remote from the saws," etc.

And he further places the defendant's charge of contributory fault on the part of young James on the ground stated in its answer, " that it charges specially that he did leave his position and follow up

46

the timber until it and his hand reached the saw, and this carelessness caused the accident," etc.

Before analyzing the evidence, or stating our conclusions thereon, we may just as well disembarrass the case of young James' minority, as he testifies as a witness that he was nineteen years of age at the time of his engagement in the defendant's service; and there is no evidence tending to show that the defendant was aware of his minority.

And it is shown that the young man was very well grown for his years and justified the assumption of his being a major, resulting from the fact which was pointed out by the witnesses—that he had made his contract with the company, and collected and receipted for his monthly wages.

Counsel for the defendant claim that after young James had served the defendant for several months in the capacity of night watchman, and afterward of lumber grader, he was assigned to duty in *trucking lumber* as it came from the trimmer, and " in doing this work he was about ten steps from the trimmer saw which afterward hurt him  * * *  and, consequently, had the opportunity to *observe* the machinery and know the danger of the situation."

They take the further position that young James subsequently worked at the " live rollers," an automatic contrivance to carry boards away after they have been trimmed; and that while thus engaged he was only about five steps from the trimming saw, by means of which he lost his hand; and that, in this way, he had become familiar with the position and movement of the saw, and knew of the danger of the employment to which he was thereafter assigned.

With these statements kept in view, we will make some extracts from the evidence and apply same thereto.

Young James testifies, in speaking of the incidents which occurred just previous to the accident, that he went to the mill to work loading trucks, but that he continued in that occupation about " *three hours* and was then changed to the live rollers." That he worked at that employment one " evening and the next day until about four o'clock."

Then occur the following interrogations and responses, viz.:

" Q. Then what did you do?

" A. The next morning I went up to go to work. Did not know

what to start at, and stayed around expecting to take my same place at the live-rollers.

" Q. What occurred then?

" A. The foreman hallowed at me—Mr. Chester was the foreman—telling me to take the place behind the edger at the trimmer.

" Q. On what day was that?

" A. On the 17th of September.

" Q. What occurred when you took your place behind the edger at the trimmer?

" A. I got back there; had not been there a minute, I suppose, when two pieces of two-by-four came through the edger, and I took hold of them.   They were crossed so I could not see the ssws; and to uncross them I gave them a push, and pushed my hand through the saw.

" Q. The saw then cut off your hand?

" A. Yes, sir.

" Q. Cut it entirely off?

" A.   Except a little skin.

" Q. Up to that time had you ever been employed in working about the machinery of the saw-mill?

" A. No, sir.

" Q. Did you have any skill or knowledge about working about machinery?

" A. None at all; no, sir.

" Q. Did any one instruct you about the duties you were about to perform at the time you were behind the edger?

" A. No, sir.

" Q. Did any one warn you that it was a dangerous place, or explain the machinery there to you?

" A. Not that I remember.   No, sir.

" Q. Well, you do remember, don't you?

" A. I do remember that no one told me.

" Q. You say Mr. Chester, the foreman, called you there?

" A. He passed by.   He was on one side of the rollers. *He pointed his finger at me, and told me to go back there.   That was all that passed—all he said.*

" Q. What is the custom of the mill about obeying orders?

" A. If I had not gone there, I guess I would have had to go home."

Again:

" Q. How far was the saw that cut your hand from where you were put to work?

" A. I don't know exactly. *I never saw the saw—never moved out of my tracks—only gave the planks a little push.*

" Q. Are you sure you did not follow up the planks?

" A. Quite sure.

" Q. When you started to put your hand out to follow it up * * * did anybody say anything to you?

" A. If they did, I did not hear it. I could not have heard a shot-gun behind that edger when it was running.

" Q. Anderson was just the length of the plank from you, on the same side, and working at the machine?

" A. Yes, sir.

" Q. You did not hear him hallow at you and warn you to let the plank alone?

" A. No, sir."

Again:

" Q. Mr. James, I will ask you this question. If you had been warned and instructed about that machine would you have put your hand where it could get cut off?

" A. I would not; certainly not."

Another witness testimony is as follows, viz.:

" Q. Mr. Morris, were you an employee of the Rapides Lumber Company when this accident occurred ?

" A. I was.

" Q. How long had you been working there ?

" A. Well, I have been working there, off and on, about four years.

" Q. Do you know this trimmer-at which Mr. James got hurt ?

" A. Yes, sir; I do.

" Q. Mr. Morris, state whether you would consider that a dangerous machine at which to place an unskilled workman ?

" A. I consider it quite dangerous; I did not like to work there myself; I call it quite dangerous.

" Q. As a saw-mill man would you consider it necessary to instruct and warn the new men that were put there ?

" A. I would; yes, sir."

This question was objected to and the answer of the witnes

thereto as eliciting an opinion; and same having been overruled the defendant's counsel reserved a bill of exceptions thereto.

In our opinion, the testimony sought to be elicited of this witness is not exclusively a matter of opinion, as it is predicated upon the facts about which he had been interrogated, and upon which he was requested to express his judgment. He had in the previous question been asked whether he considered a trimmer saw a dangerous machine, and replying thereto without objection he said he considered it quite dangerous.

The present question is, being by you considered a dangerous machine, "would you consider it necessary to instruct a new man," to that effect ?

Taken in that connection it was a proper question.

In the further interrogation of this witness he stated, in confirmation of the testimony of young James, that Mr. Chester, the foreman, said to him when assigning him to duty at the trimmer "You work over that way," pointing in the direction of the edger. He states that this was the direction which was given to young James in his presence.

On cross-examination this witness was asked the following question, and thereto made the following replies, viz.:

" Q. Well, are not those two saws on the trimmer in plain view from almost anywhere around the mill?

" A. I always saw the saws. I knew where they were. I did not run into them. *At the place where this man was working this board covers the saw, and might worry a person who did not know the saw was there.*

\*        \*        \*        \*        \*        \*        \*

" Q. Well, is not that saw in plain view of a man standing in the proper place—there when James was put to work?

" A. I do not think it is. These planks may be rather in the way. A man not knowing where to look for the saw might not notice it. But you can see the saw from where he works.

" Q. The plank is high enough up to see under it?

" A. He can see under it or over it, either one. *If he undertakes to look for the saw he can see it.*"

The board referred to by this witness is the swinging board that is exhibited in the photographs, and is shown by the testimony to be

employed as a protection to the employees against injury from the small ends of the planks which are cut off by the trimmer saws.

" Q. What particular skill or experience does it require for a man to go there and do that work—to put the plank on the trimmer?

" A. *It requires a man who knows something about it. He must know something about it, or he might do like this man and get his hand cut off.*"

Mr. Julius Levin, a saw-mill proprietor of large experience, was also interrogated with the following result, viz.:

" Q. If you should place a green hand (at work) at the machinery would you not consider it your duty to instruct him as to his danger and duties?

" A. I would have him instructed.

" Q. State whether or not you consider that position I have just mentioned—at the trimmer—a dangerous position, particularly for a green hand?

" A. All positions behind *any saw* are dangerous if a person is not *very careful.*

" Q. It requires a good deal of skill and activity?

" A. *A great deal of care and watching.*"

The foregoing is a fair summary of plaintiff's evidence; though there are some general statements of the defendant's witnesses which differ therefrom in minor particulars.

The testimony of Mr. Chester, foreman of defendant's mill, is of the following tenor, viz.:

" Q. How long had had you been working at this mill of the Rapides Lumber Company when this accident happened to Mr. Tony James?

"A. I had not been there but a short while, probably a month or six weeks. I went to work on the 28th of July," but he was foreman at the time of the accident.

Again:

" Q. When you told Mr. James to go in there—*i. e.*, to the trimmer machine—and take Boone's place did he make any objection to it?

"A. He did not.

" Q. Was it done suddenly, or hurriedly, or in such a way that he was obliged to?

"*A. I simply told him to take that position, and he just walked in, and went at it. I went back into the fire room,* " etc.

In conclusion we will refer to the statement of Mr. Anderson, who was the associate of young James and saw the accident, and thus describes it, viz.:

"There were two two by fours and Mr. James and I caught hold of a piece of lumber—he caught one end and I caught the other—and we carried it and put it on the trimmer chains; and one of the two by fours got on top of the other two by four and Mr. James undertook to shove one off the other, and carried his hand up on to the other, and carried his hand up on the saw."

He then stated that in making this movement young James moved just a little from his position in the effort to push the planks, and that as he did so " he hallooed as loud as he could to let it alone—that he just screamed—but he followed the timber until it got to the saw."

In so doing young James was attempting the performance, ignorantly, of an office which the machinery was provided to do without his aid—and this was evidently the result of his inexperience and want of information as to his duties.

No particular analysis of the foregoing testimony is deemed necessary. That the employment to which young James was assigned was dangerous we make no doubt, We think the dangerous character of the trimmer-saw is made clear by the testimony, and is made apparent by the photographs.

To our thinking, the mere recital—even as it is related in the defendant's answer—of the occurrence, discloses a *prima facie* case of negligence on the part of the defendant.

The proof discloses a total want of knowledge on the part of young James of the situation, and of the duties he was expected to perform; and of which he was vouchsafed not a word of information or instruction by the defendant's foreman.

Suddenly called upon by the company's foreman to undertake the performance of a delicate and important duty, in a saw-mill in full operation, and supply the place of a sick man who had been engaged thereat for about two years, without warning or precaution, young James was unwittingly cast into the teeth of a small saw which cut his left hand off *within twenty seconds after he had assumed its performance.*

Plaintiff's counsel graphically describes the situation thus:

" Into this trap of flying wheels, machinery, belts and whistling saws, noise, dust, plank and rollers, Chester thrust, without a

moment's warning, advice, instruction or preparation, a boy, a
minor, who knew nothing of its dangers."

It is quite out of the question for us to affirm, under these circum-
stances, that young James had assumed the responsibility of the
dangers of the position to which he had been assigned.

In our opinion his right to recover damages of the defendant is
very clear, under the provisions of the Code. R. C. C. 2315, 2317
and 2820.

And likewise under the construction of the general law applicable
to master and servant, which is given in the decisions cited in Stucke
vs. Orleans Railroad Company, 50 An., omitting those appertaining
to fellow-servants as not pertinent to the issue.

Under all the authorities, it is the recognized and bounden duty of
the master to provide a reasonably safe place at which his servant
is to work; and to see to it that he is not exposed to unnecessary
risks in the course of his employment. And in order that a dan-
gerous service be intelligently undertaken by his servant, it is the
duty of the master sufficiently to acquaint him with its risks and
dangers, and give him a fair knowledge of the situation at the time
of his employment. Failing in either of the foregoing particulars,
the master will be held liable for whatever injury results to the
servant. Cooley on Torts, Sec. 550; Ryan vs. Fowler, 24 N. Y.
410; Perry vs. Marsh, 25 Ala. 659; Horner vs. Nicholson, 56 Mo.
220; Wheeler vs. Wason Manufacturing Co., 135 Mass., 135; Mason
vs. West, 73 Maine, 253.

In Smith vs. Sellers, 40 An. 527, this court said that the servant
" assumed the risk only of such hazards as are apparently incidental
to an employment intelligently undertaken."

In Erslew vs. Railroad Company, 49 An. 86, we held that if an
employee of a steam railway company knew or ought reasonably to
have known the precise danger to him of the guy wire of the electric
street car company in the course of his employment, and saw fit,
notwithstanding, to continue in it, he might be held to have assumed
the extraordinary risks, as well as the ordinary risks of his service.
But this consequence must rest upon positive knowledge, or reason-
able means of positive knowledge of the precise danger assumed.
Meyers vs. Railroad Company, 49 An. 21; Myhan vs. Electric Light
and Power Co., 41 An. 964; Buswell, Law of Personal Injuries, Secs.
202, 203; Tutrix vs. Sellers & Co., 39 An. 1011; Helen vs. O'Rourke,
46 An. 178.

See Buswell on Personal Injuries, p. 338. And we take following extract from 146 Mass. 190, Civiac vs. Woolen Company, viz.:

"The duty of the defendant would be sufficiently discharged by pointing out to the plaintiff the situation of the machine, and the rapid revolution of the wheels when in operation, and explaining the effect of touching them under these circumstances."

This statement of the law we accept as perfectly accurate; but when it is applied to this case, it is made evident that the defendant's foreman was greatly in fault, in that he gave young James no explanation or instructions of any kind.

Indeed, the foreman had, necessarily, an imperfect knowledge of the situation, as he had been in charge of defendant's mill only for a few weeks at the time of the accident.

With regard to the plaintiff's demand for insurance money, but little need be said. The demand is made of the defendant as a *negotiorum gestor;* and not on a claim arising *ex contractu*, against the insurance company, as being liable for a loss sustained on its policy.

We do not think that his demand against the company is well founded, as he avers that it has not yet recovered from the insurance company; and the plaintiff could not, in any event, recover from the insurance company, because his name does not appear as a beneficiary in either one of the policies which were written in favor of the defendant exclusively.

That the defendant had made exactions of young James monthly, from his wages, in order to keep up the premiums, can not have the effect of establishing in his favor a beneficial interest in the insurance policy.

The contrary doctrine was maintained by this court in Putnam vs. Insurance Co., 42 An. 740.

We are of the opinion that so much of the plaintiff's demand as relates to the insurance must be rejected and disallowed, and the amount of the demand for damages be reduced to three thousand dollars.

It is therefore ordered and decreed that the judgment appealed from be so amended as to reject and disallow the plaintiff's demand for one thousand dollars insurance, and thus reduced to three thousand dollars, same be affirmed with costs of appeal to be taxed against the plaintiff and appellee—with the reservation of whatever

rights he may have against the defendant upon a *quantum meruit* for an interest in the insurance money when same has been collected.

The opinion of the court on the application for rehearing was delivered by BREAUX, J.

ON APPLICATION FOR REHEARING.

BREAUX, J.  Three witnesses for the plaintiff, men of experience in the management of saw-mill machinery stated that there was danger, if one without experience or instruction of any sort undertook to work as a hand at the machine known as the trimmer.

That it is unsafe to place one at that work who is a green hand without warning or instruction. That the danger should have been explained to him; that it was an act of imprudence to call the plaintiff, who had been engaged elsewhere in the mill, and at once give him in charge the work necessary to be done at the end of the trimmer in transferring the lumber from the edger to the trimmer.

On the other hand, three witnesses for the defendant testified that the work was not as hazardous as represented; that men without experience and warning sometimes were placed to work at trimmers.

The jury and the trial judge who saw and heard the witnesses believed the former.

Great weight, it is clear, should be given to their finding as relates to the facts of the case.

It does seem that the act of the plaintiff in putting his hands on two pieces of timber, 2 x 4 (crossed one over the other), as they were about to pass the trimmer saws, was an act of the greatest imprudence; that one with the least experience or warning would not have thus exposed himself. The plaintiff, it appears, was not deficient in intelligence. Had he been made aware of the danger, it would be proper to hold that he had assumed the risk of the dangerous employment. It must have been evident to the jury he had not had sufficient opportunity to become familiar with his duties nor had he been, it appears, sufficiently instructed. It was not, the jury found, an ordinary danger. It was not, their verdict implies, a danger known to the employee, and one which he, without warning, should have appreciated. The defendant in the brief asserts, in opposition to the position that the plaintiff should have been warned and instructed before placing him at the trimmer, that the only instruction which could have been given him would have been not to

put his hand on the saw, and that this would have added nothing to his knowledge.

This contention, as stated by defendant as relating to visible danger, is supported by several well considered decisions of courts of other States. From the point of view just stated they recommend themselves as eminently just and correct.

But the jury here, substantially, found a different state of facts. They must have concluded, in order to arrive at their verdict, that the instruction which could have been given him would have been given had it not escaped attention; that is, the instruction not to put his hands on the pieces of lumber after having placed them on the trimmer, and particularly after they were being carried on the endless chains to the saws.

We have no hesitation in saying, if the facts were as the verdict implies, the judgment was correct and legal.

The evidence before us did not disclose that the facts were not as found by the jury.

There is no good reason to infer that the foreman of the mill did not have a proper knowledge of the situation, and that he was not, in every respect, a well qualified and competent foreman. But the ability of the foreman is not of itself ground to discredit the return of the jury. Under the most careful and experienced foreman an accident may happen for which the employer must be held in damages.

It may be stated, also, as related to the lumber mill, that the situation was not more grave and dangerous than it is in all factories in which there are many fast revolving circular saws with white steel surface a few inches above the horizontal line of their shafts.

It is not negligence to own and operate such machinery—the demands of commerce require effective, improved machinery. In the case here it was not defective and not unavoidably dangerous. The fact remains that it was not properly handled, due, as the jury thought, to the want of notice and instruction which should have been given to an inexperienced hand. Under our jurisprudence, until it clearly appears that such a finding is erroneous, we are constrained to accept the conclusion as correct.

Lastly: our decision held that claim for insurance can not be recovered in this case. Defendant asserts that reservation in the

decree invites new and troublesome litigation. In order to put that matter at rest, we here state that the judgment here includes and settles the amount of all claims plaintiff is entitled to for injuries received by him as alleged. When this amount will have been paid it will be in satisfaction of all claims, and we, in consequence, recall all reservation heretofore made.

It is therefore ordered, adjudged and decreed that our original judgment remain undisturbed, save as to anything reserved to plaintiff, after he will have been paid. There is no further right reserved to plaintiff.

Rehearing refused.