(36 South. 952.)

No. 15,149.

CARTER v. FRED W. DUBACH LUMBER CO.*

(June 6, 1904.)

INJURY TO SERVANT—WARNING OF DANGER— NEGLIGENCE.

1. The servant has a right to assume superior knowledge in his employer, to rely on his judg-

*Rehearing denied June 25, 1904.

ment, and to believe that he will not unnecessarily jeopardize his person and life by avoidable risk.

2. The employer is presumed to know the danger to which the employé will be subjected in the discharge of the duty to which he is assigned, and, if the latter be inexperienced, is bound to warn him of such danger.

(Syllabus by the Court.)

Appeal from Fourth Judicial District Court, Parish of Lincoln; R. B. Dawkins, Judge.

Action by George W. Carter against the Fred W. Dubach Lumber Company. Judgment for plaintiff. Defendant appeals. Amended.

Barksdale & Barksdale, James Legendre, and Edward Rightor, for appellant. Clayton & Hawthorn, for appellee.

## Statement of the Case.

MONROE, J. Plaintiff sues for damages for personal injuries received whilst working in defendant's sawmill, in consequence, as he alleges, of defendant's failure to take proper precautions to protect him against, and to warn him of, the dangers of the duty to which he was assigned. Defendant pleads contributory negligence, and alleges that plaintiff was mentally and physically "deranged" by the excessive use of morphine. The evidence shows that plaintiff is a laboring man, 45 years old, and has a wife and six children; that, up to the time of his employment by defendant, he had worked on a farm and knew nothing about machinery; that, about two months prior to September 17, 1902, he entered defendant's service, and was employed in handling logs at the pond and in assisting at the lathe mill, save upon two occasions, when, for about an hour each time, he was assigned to the duty of "tailing the edger"; and that upon the morning of September 17th he was again assigned to that duty, and had been engaged in its discharge for about two hours, when he met with the accident of which he here com-

plains. It is not suggested that, in working at the pond and in the lathe mill, he acquired any experience that should have availed him in "tailing the edger"; and it is admitted that he was assigned to the duty last mentioned without warning or instruction of any kind. The "edger," as the name indicates, is an apparatus which takes off the uneven edges from lumber to which logs have been reduced by being sawed in one direction, or plane, and in this instance consists of a table 22 feet long, 6 feet wide, and 2 feet 6 inches high, at one end of which, projecting through the upper surface, are the saws by which the edges of the lumber are taken off, and across which, at intervals of 3 feet, are rollers, live and dead, also projecting through, or bisecting, the upper surface of the table.

The live rollers, of which, at the time of the accident, there were five, have a movement of their own, as will be explained hereafter, and hence aid in passing the lumber and the edges taken off by the saws along the surface of the table. The dead rollers, of which there were two, have no movement, except that communicated by the lumber or the edges, and merely facilitate the passage of that material. The duty of the "tailer" is to receive, at the other end of the table, the lumber and the edges as they are thus passed from the saws, and to remove them out of the way. It not unfrequently happens, however, that in consequence of irregularities in their dimensions the edges lodge between the rollers, and, operating somewhat as a dam, obstruct the current of material flowing from the saws, and in such cases it is necessary for the tailer, in order to reach and remove the obstruction, to leave his post at the end, and move to the side, of the table, and it was whilst so engaged that the plaintiff was injured. The live rollers, forming part of the edger at which plaintiff was working, are driven by a counter shaft, which extends longitud-

inally, just beneath and near the upper surface and edge of the table, and the gearing which connects each roller with the shaft consists of two beveled cogwheels, the one on the shaft, and the other on the end of the roller, which work upon each other, facing outward. The greater part of the wheel which is attached to the end of the roller is above the surface of the table, and is protected by a cast iron hood, as is also that portion of the shaft wheel which projects above the surface. The greater part of the shaft wheel and the point of contact between the two wheels are, however, below the surface of the table, and, being unprotected, will draw in and crush anything, not too large or too dense, that may be brought in contact with them. The defendant insists that the shaft wheel projects beyond the side of the table and is plainly visible, and there is some testimony to that effect. The plaintiff insists that it does not so project, but is wholly beneath the table, and is so set back as to be visible only from a point two or three feet from the side of the table, and there is also testimony to that effect.

It is admitted that, within a week or two after the accident to the plaintiff, those portions of the wheels which are below the surface of the table were covered by a plank, which was nailed or otherwise fastened along the side of the table, and that, as thus arranged, it is impossible for them to inflict an injury such as that inflicted upon the plaintiff. No details in regard to the manner in which this plank is adjusted are given, and it is clear that it could not have been fastened immediately against the side of the table, if there were cogwheels projecting therefrom at intervals of three feet. The plaintiff testifies that he had never seen the cogwheels, and did not know that they were underneath the iron hoods that appeared above the surface of the table; and the evidence shows that, prior to the accident to the plaintiff, the clothing of five different work-

men had been caught in the same wheels, or others similarly arranged; that the clothing of one man had been caught twice; and that the clothing of two of them had been caught whilst they were seated on the table, over or near the iron hoods by which the upper sections of the wheels are concealed. These men appear to have escaped injury by cutting their clothing off, or by its giving way and being torn off. The superintendent of the mill testifies that he knew, before the accident to the plaintiff, of two of the occurrences thus mentioned; the one when "Willard got caught in the gear and was wound up," and the other when an Italian, who had seated himself on the table, was so caught. It is not suggested that any of the men thus referred to were addicted to the use of morphine, and the only evidence in regard to the use of that drug by the plaintiff is that given by him and others to the effect that he had been using it for some years, that he called for it when injured, and that he carried it on his person. On the other hand, it is shown by defendant's witnesses that plaintiff discharged all the duties assigned to him punctually, intelligently, and faithfully, and the theory that the accident was attributable to the use of morphine is not sustained. Upon the morning of the accident, the plaintiff reported, as he had been doing, for work at the lathe mill, but was ordered by the superintendent to work at the edger, and he had been working at the edger for about two hours, when one of the strips, or edges, "got crossways," and "he went around to shove it off at the side of the table," and whilst so engaged his clothing was caught in a pair of the cogwheels to which we have referred, and before he could be extricated, or the machinery stopped, his left arm was torn off between the elbow and the shoulder, his right arm was broken, three of his ribs were torn from his breast bone and also from his back bone, the flesh was torn from his throat in such

manner as to expose the blood vessels and the lower part of his tongue, and he was otherwise injured. The physician who attended him says:

"Well, after I got through that morning, I told some of them that I had just fixed him up for a decent burial. I didn't believe a man could ever live under those circumstances."

Upon November 12, 1903, nearly 14 months after the accident, the plaintiff was still unable to make any great use even of the arm which is still left him, and we think it reasonably certain that he will never be able to do any work of consequence, and will always suffer from his injuries. There was judgment in the district court in favor of the plaintiff for $2,500. The defendant has appealed, and the plaintiff has answered, praying that he be allowed $5,000.

### Opinion.

If it be true that a portion of the cogwheel that was attached to the shaft, and the upper section of which was covered by the iron hood, projected beyond the side of the table, and if it could be said that the risk to the workman, "tailing the edger," that his clothing might be caught between the partially concealed under section of that wheel and its mate on the roller, was an obvious one, nevertheless that risk was wholly unnecessary, since it is admitted that it was entirely removed by the simple expedient of covering the exposed portions of the two wheels with a plank, adjusted to the side of the table. But, whether the shaft wheel projected beyond the edge of the table or not, the danger of being caught between it and its mate was not an obvious one, since the upper sections of both wheels were covered and the lower sections concealed by the iron hoods, and the roller wheel, at least, was set back, well under the table, and the lower sections of both wheels are below the range of vision of a man standing or moving near the table. Under these circumstances we find no difficulty in

crediting the testimony of the plaintiff to the effect that he never saw the cogwheels, and did not know that they were under the hoods, and did not know that he was incurring any risk from them by removing the irregular pieces of wood from the table in the manner in which he had seen them removed by others. The plaintiff, it will be remembered, was a raw countryman, whose entire experience in sawmills and machinery had been embraced within the two months during which he had been in the defendant's employ, and of that time he had worked but four hours in dangerous proximity to the machinery.

It is shown that on six different occasions, prior to the accident in question, two of which were brought to the knowledge of the superintendent of the mill, the clothing of workmen had been caught as was that of the plaintiff and that they had escaped injury, and perhaps death, only by cutting, or breaking, themselves loose, and it is admitted that the plaintiff was never at any time given one word of instruction or of warning with reference to the work or the danger incident thereto.

The legal principles applicable to the facts disclosed are well settled:

"The servant has a right to assume superior knowledge in his master, to rely on his prudence and judgment, and to believe that he will not unnecessarily jeopardize his person and life by avoidable risk." Myhan and Wife v. Electric Light & Power Co., 41 La. Ann. 965, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436.

"A superior is presumed to know whatever may endanger the person and life of an employé in the discharge of the duties of his employment, and is bound to especially warn him of the nature of the danger, unless said employé well knew of the existence and extent of the hazard or risk, or willingly exposed himself to it." Stucke v. R. R. Co., 50 La. Ann. 172, 23 South. 342; James v. Lumber Co., 50 La. Ann. 717, 23 South. 469, 44 L. R. A. 33; Daly v. Kiel, 106 La. 170, 30 South. 254.

The plaintiff, a man in the prime of life, with a family dependent on him, has been subjected to suffering which can be better imagined than described, and has been reduced to the condition of a physicial wreck, with one arm gone, the other arm partially incapacitated, and lesions about his body, resulting from the tearing loose of his ribs, which hamper his movements and give him constant pain and annoyance. In view of the facts as presented, we are of the opinion that the amount allowed should be increased from $2,500 to $5,000, as prayed.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount thereof to $5,000, and, as amended, affirmed, at the cost of the defendant.