PROVOSTY, J.
The defendant is a sawmill company, operating a railroad for hauling logs. The plaintiff’s son, a youth lacking five days of his seventeenth year, was killed by being run over by one of the cars of the defendant. He was fireman on one of the locomotives of the defendant, and part of his duty was to act as switchman; and it was while acting in the latter capacity that he met his death, A car heavily loaded with steel rails had to be transferred from the main line to a switch track. A locomotive stood at each end of this car, within ten feet. One was the main-track engine. It could have coupled to the car and pushed it on the switch track without the slightest risk to any one, and in two or three minutes’ time. It stood there on the track doing nothing. The other was the switch-track locomotive. Unlike the first, it could not have switched the car by pushing it, but would have had to pull it, or, in other words, to precede it on the switch track, and thus find its return to the main track intercepted by the car. This was undesirable, as it was needed on the main track. But the work of switching this car was more specially its own than that of the other locomotive, Nevertheless, in view of the situation, it sent word to the other, or so-called main-track, locomotive to switch the car. This most reasonable request was refused. Then the engineer determined to switch the car by the chain-switch method. This consists in connecting the car and the locomotive by a chain 20 to 30 feet long, and throwing the switch after the locomotive has passed, but in time for the car. The young man was directed by the engineer to attach this chain, and he did. The chain broke at the first trial, and the young man was directed to tie the break for another trial. This was done, and with better success. The locomotive backed on past the switch and stopped, after having moved about 80 or 90 feet from the point of departure. The car took the switch. *246 The switch track being but very slightly divergent, the moment the locomotive became stationary the car began to approach it, and, as a consequence, the chain began to slacken. When the head of the car passed the head of the locomotive the chain tightened again, and continued to tighten with increasing strain as the ear went on. Plaintiff’s son was between the chain and the car, near the head of the car. When the ear got about abreast of the locomotive the chain snapped midway. The witnesses are unable to say whether it was the sudden taking up of the slack or the rebound of the ends of the broken chain that struck the young man; but one or the other did, and threw him under the front truck of the car. The engineer had seen his danger and had cried to him to get out of the way, but apparently he had not heard, owing, probably, to the noise of the car and of the escaping steam. He was run over, and so severely injured that he expired almost instantly. He had been occupying the same position of fireman and switchman for one month, and during that time had worked off and on — not regularly. He had taken the employment without the knowledge of his father. The latter point, however, is immaterial, in view of the fact that the father was absent, and that the sister and brother-in-law of the youth, who stood towards him in loco parentis, must have known of his being engaged in the work, and do not seem to have objected.
The grounds on which the damages are claimed are set forth as follows:
“That the employment of this boy by said company in such capacity, and the handling of this engine by the train foreman as above described, which caused the death of petitioner’s son, furnishes an instance of gross, criminal, and willful negligence and disregard for human life which justifies a judgment against said defendant company in a large amount as damages. * * •
“He shows that he was greatly attached to his son, and that the anguish and mental suffering caused him by the loss of his boy cannot be compensated by the amount sued for or any other amount in money; but he shows that said defendant company should suffer to the amount claimed for their reckless disregard of human life and for their criminal negligence, which resulted in the death, of his boy.”
Defendant contends that inasmuch as punitory damages cannot be awarded in a case of this kind, where no malice, or recklessness equivalent to malice, is charged, and inasmuch as plaintiff avers that his anguish and mental suffering at the loss of his son cannot be compensated in money, and inasmuch as these are the sole grounds upon which plaintiff claims damages, the petition shows no cause of action. We do not concur in that view. The petition, taken as a whole, alleges that while no amount of money can compensate plaintiff for the loss of his son, yet that he has suffered greatly, and that for these sufferings, and also by way of punishment, the defendant should be made to pay him $10,000.
When a chain switch is made, the opportunity of the slackening of the chain must be taken advantage of for detaching the chain: otherwise, there is the possibility of the momentum of the car being too great to be cheeked by the back pull of the chain, or by. the putting of chocks under the wheels, and then, owing to the divergence of the tracks, one of two things must happen — either the chain must break, or the car or the locomotive must be pulled off the track. If the chain breaks, its ends are liable to strike any one within reach, as happened in this case. The proper way to detach the chain is for the switchman to stand on the foot-board of the locomotive on the off side. After the chain is thus detached, there is danger of its getting under the wheels of the car and derailing it The witnesses agree in saying that it is an operation requiring great nicety of execution, and fraught with danger all around. So well recognized is this that the rules of railroads prohibit it, except in cases of necessity. It seems that, unless the brakeman is fore *247 warned, the situation is such that he' is more likely than not to put himself in between the chain and the car, as plaintiff’s son did. An old, experienced engineer testifies:
“A man that don’t understand what _ he , is doing will invariably get between the chain and the car.”
The proper person to have instructed this young man would have been the engineer under whose orders he was working. But he got none from him, except the general advice to be careful and keep out of danger. The only instruction he received was from the woods foreman that he must keep out of the reach of the chain until the ear has stopped; that is to say, an instruction altogether misleading. No one seems to have told him of the proper way to detach the chain. We think he should have been warned specifically of the danger which he was called upon to encounter and which proved fatal.
“If the master knows that the employment is dangerous, or ought to know it, and also knows that the servant is ignorant and inexperienced in the employment and has no knowledge of the dangers incident thereto, it is his duty to warn the servant as to the danger and instruct him to avoid it. This is an imperative duty, and if the failure to perform it results in injury the master is liable.” A. & E. Ency. of L. vol. 20, p. 97; Lettie Thompson, Tutrix, for the use, etc. v. N. O. & Carrollton R. Co., 108 La. 52, 32 South. 177; Prank Daly v. Christ Kiel, 10G La. 170, 30 South. 254; Jos. D. James, for Use, etc., v. Rapides Lumber Co., Ltd., 50 La. Ann. 717, 23 South. 469, 44 L. R. A. 33; William Myhan and Wife v. La. Electric Light & Power Co., 41 La. Ann. 968, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436; Stewart v. T. & P. R. Co., 113 La. 525, 37 South. 129.
Prom the fact that this young man thus deliberately or blindly put himself in this death trap — did the very thing he ought not to have done — defendant argues that he was guilty of contributory negligence, precluding recovery; but that fact appears to us to condemn defendant all the more strongly, from the improbability that the young man would have done such a thing if he had been properly warned. He was a sensible, intelligent young man, disposed to do well, who ■would hardly have done the very thing he had been told not to do.
Plaintiff asks us to increase the amount of $5,000 allowed by the jury; but we see no reason for disturbing the verdict. The allowance is strictly for the sufferings of plaintiff. This is not a case for punitory damages. The negligence was not of that gross character amounting to malice or recklessness, Black v. Railroad Co., 10 La. Ann. 38, 63 Am. Dec. 586; Hamilton v. Railroad Co., 42 La. Ann. 824, 8 South. 586; McFee v. Railroad Co., 42 La. Ann. 790, 7 South. 720. And no right of action is set up as having been inherited from the deceased.
The question of the allowance of damages to a parent for his mental suffering from the death of a child was very fully considered by this court in the case of Sundmaker v. Yazoo & M. V. R. Co., 106 La. 111, 30 South. 285, on application for rehearing, though the report of the case does not show it; and an amount of $4,000' was allowed. The child there was an infant, and had been instantly killed. The closely analogous question of allowing damages for the mental suffering of a mother who had been deprived of the consolation of attending the dying bedside of her son was very fully considered in the case of Graham v. Western Union Tel. Co., 109 La. 1069, 34 South. 91. In both of these cases the conclusion was deliberately reached that such an element of damage must be considered under our Code.
Judgment affirmed.
BREAUX, J., concurs in the decree.