(70 South. 57)

No. 20063.

BRALEY v. PINE WOOD LUMBER CO., Limited.

(Oct. 18, 1915. On Application for Rehearing, Nov. 15, 1915.)

*(Syllabus by the Court.)*

1. MASTER AND SERVANT ☞150—INJURY TO SERVANT — PROVISION AGAINST DANGER — LIABILITY OF MASTER.

When the employer knows the danger to which the employé will be subjected in the discharge of the duties of his employment (and, though he may not, in fact, know it, the law will presume that he does), he is bound to provide against it, if reasonably possible, or else, to warn the employé unless the employé is already advised of it, or unless the danger is obvious to a person of ordinary intelligence and experience, upon penalty of being liable in damages for the injury that the employé may sustain by reason of his (the employer's) failure to discharge these obligations.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299–302, 305–307; Dec. Dig. ☞150.]

2. DAMAGES ☞58—INJURY TO SERVANT—LIABILITY OF MASTER—WHERE MAGNIFIED BY NEGLIGENT ATTEMPT TO MINIMIZE.

Where an employé is injured through the fault of the employer, the obligation rests upon the employer to minimize, as well as repair, the damage resulting from the injury, and he is not relieved of the obligation to repair where his effort to minimize, though made in good faith, results, through the negligence of the agent selected, in magnifying, the damage.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 106, 107; Dec. Dig. ☞58.]

Appeal from Second Judicial District Court, Parish of Webster; J. N. Sandlin, Judge.

Action by James Braley against the Pine Wood Lumber Company, Limited. From a judgment for plaintiff, defendant appeals. Affirmed.

Henry Moore, H. H. White, and White & Thornton & Holloman, all of Alexandria, for appellant. Stewart & Stewart, of Minden, for appellee.

### Statement of the Case.

MONROE, C. J. Defendant prosecutes this appeal from a judgment awarding plaintiff $4,000 as damages for personal injuries sustained while in the discharge of duties for which defendant had employed him. Plaintiff has answered the appeal, praying for an increase in the amount of the award.

According to the evidence, plaintiff had spent his life upon a hill country farm, and, without acquiring education, means, trade (other than farm labor), or profession, had married before attaining majority, and in

January, 1911, had found employment in defendant's mill, at first in "trucking lumber," then in backing wagons to the machines for loading, and finally in feeding "planers," at $1.75 a day; and it was while attempting the discharge of a function incidental to the work last mentioned that on November 15, 1911, he (being then about 23 years of age, with a wife and two children) met with the accident and received the injuries of which he here complains.

The planer building is (approximately) 140 feet long (running north and south) by 80 feet in width, and consists of, what may be called, a ground floor, which is the ground itself (upon which are established the shafting, driving wheels, or pulleys, and gearing), and the main floor (where the planing machines are established and operated).

The ground slopes from west to east, so that the elevation of the main floor, on the east side, is 7 or 8 feet, but the light is cut off from the ground floor on that side by cars, loaded or unloaded, which are usually standing upon a tramway laid near the building. On the west side the ground rises nearer to the main floor, and the floor, in whole or in part, is extended to meet it, and affords a means whereby wagons may be driven into the building, and whereby, also, the light is excluded from the ground floor. The north and south ends of the building, which are open, are therefore the main sources of light for that floor and furnish the only means of access thereto, with the exception of an opening in the main floor 2x4 feet in size through which such access is furnished by means of a rough ladder, and through which a certain amount of light is admitted, and with the further exception of an aperture 10x18 inches in size through which the belt which drives the planer passes. On November 15, 1911, plaintiff was engaged in feeding planer No. 5, which is situated on the main floor, about midway between the north and south ends of the building, but nearer the west than the east side, and Mr. Russell, the foreman of the mill, standing at his side, had instructed him to "shut down," which he did, when the belt slipped off the pulley (on the ground floor), and plaintiff went down through the opening in the main floor, about 15 feet distant, upon the ladder, in order to replace it, and, reaching the ground, started by the most direct route towards the pulley, which was, say, 8 feet from the foot of the ladder. In so doing it was necessary for him to step from the ground, where the foot of the ladder rested, upon a piece of squared timber, and thence to another piece of timber and over a countershaft fastened thereto, upon which there was a collar, with a set screw projecting through it, say five-eighths or seven-eighths of an inch, whereby the left leg of his trousers was caught, with the result that in a moment he was stripped of his clothing save his shoes and socks, and his left leg about the knee was badly mangled; the description of its condition, as seen by a physician a few hours later, being as follows:

"Well, the muscle of the ligament, or synovial sack, was torn open, and you could see in between the joint and the knee and the kneejoint proper, and the synovial fluid had escaped, and that tendon that the kneecap is in was all torn apart, except a little bit on the under side, and the kneecap was in several pieces, I don't know how many pieces, and he had bruises all up his thigh and his side. That was about the condition I found him in."

The accident occurred about 3 o'clock in the afternoon, and Dr. Browning, a local physician who was called, reached plaintiff, at the house of his brother-in-law, to which he had been carried, some two or three hours later. Being asked what was done in the way of treating him at that time, he replied:

"There wasn't anything, proper; I bound his knee up with bichloride gauze."

The explanation given for the failure of the local physicians (there having been two

present) to do more than as thus stated is that it was thought advisable to send the patient at once to a hospital or sanitarium, where better facilities would be found for handling his case; the first suggestion being that he be sent to Shreveport. Mr. Giles, the manager of the mill, however, thought that it would be better to send him to Texarkana, to "Dale's Sanitarium," as, by leaving on the 7 o'clock train, he could reach there by 9:30 o'clock that night, whereas there was no train by which he could reach Shreveport before 12:30 o'clock the next day, and it was considered desirable that his leg should be operated on as promptly as possible. It was then ascertained that neither the plaintiff nor his father had any money wherewith to defray the expense, and the manager of the mill offered to pay it, and charge it to the father, which offer having been accepted, plaintiff was sent to Texarkana, accompanied by Dr. Browning, and reached Dr. Dale's place about 10 o'clock that night. Dr. Dale not being there at the time, Dr. Browning went out to look for him, and met him on the street. He explained the nature of the plaintiff's injuries, and asked Dr. Dale to operate on him at once, but Dr. Dale said that it would do just as well to operate the next morning, and he so told plaintiff, after which Dr. Browning returned home. As a matter of fact, the operation was not performed until the next evening. Dr. Dale says that the wound was dressed in the meanwhile. The boy says that it was not "looked at" until the evening after his arrival. Dr. Dale says that the boy left the hospital on November 29th; that he had insisted from the time of the operation upon going home, and that on the day mentioned he (Dale), at plaintiff's urgent request, instructed the nurse to telephone plaintiff's people to send for him; that he had warned him that he might aggravate his condition and lose his leg; but that plaintiff thought that he could be treated at home. Plaintiff says that he asked Dr. Dale, when he was first taken to the hospital, how long he would have to stay, and that Dr. Dale replied that he did not know; that he did not insist upon going home, but was willing to stay in the hospital as long as it was necessary, and that the first that he knew about his going home was when he heard the nurse telephone to his people to send for him, and the ambulance came to bring him to the train; that he then considered that Dr. Dale was sending him home, and, as he had no money with which to pay his expenses, that there was nothing for him to do but to go; and that he left the hospital on November 27th. Dr. Browning testifies that he saw plaintiff after he returned home, and thinks it was on November 28th. Dr. Dale and Dr. Browning agree that a stiff knee was inevitable, or almost so, and that it was of prime importance that the ankylosis should take place with a certain bend at the knee, rather than with a straight leg, which would be equally inconvenient and disabling, walking or sitting, and yet there is no contradiction of Dr. Browning's or plaintiff's testimony to the effect that, when the latter returned from the hospital, his knee was badly infected, and badly dressed, and, if anything bent the wrong way; the doctor's testimony upon the subject reading as follows:

"It was badly infected and ankylosed. The bones had grown together. * * * They had a pasteboard splint, straight pasteboard splint, under his knee, coming in way up the thigh, and halfway down the leg, with a roll of cotton, a small roll of cotton, in the flex of the knee, and then gauze, plain gauze, over the kneecap and bandaged. * * * That held it [the leg] straight. * * * Q. You say the knee joint had ankylosed, or grown together? A. Yes, sir. Q. Was it straight or crooked? A. It was straight, if anything, flexed, or bent back in the knee. Q. Well what was the chance of giving the knee a different angle after that, after he came back to your care? A. Well, it could have been broken apart and set with splints in that shape. Q. Could an operation of that kind have been performed then; was he in condition to stand it? A. No, sir. Q. You stated that his knee was

infected. Just explain what you mean by that. A. Well, pus infected by inflammation, and had a great deal of pus in the joint and around the joint. Q. How long did you have to treat him to get that pus formation stopped. A. Well, we never have got it entirely stopped. It runs some yet, I think. * * * Q. What did you find as to those broken, crushed parts of the patella, or kneecap? A. That was partly necrosed, necrosing, came out; it was decaying. Q. Had they been sewed together or wired together in any manner? A. Been sewed together with silk thread. Q. Did the stitches hold? A. No, sir. Q. When you went to him after he had first returned from Texarkana, was there any mobility in that kneejoint? A. No, sir. Q. Then is that condition permanent; will he ever have any? A. No, sir; never have any."

Plaintiff himself, after testifying to his suffering for several months and to the fact that his wounded leg is still suppurating, describes its present condition as follows:

"Q. Well, can you sit down the way people ordinarily sit? A. No, sir; if I sit flat down, my leg will kick up. I have to raise up this if I sit in a chair; I have to lean over this way. Q. Well, could you walk sufficiently to do such a thing as drive a team or handle stock? A. No, sir; I could not keep up with them unless they just poked along. Q. Can you walk with any comfort, or with comfort? A. Not any at all; can't walk without suffering, at all; hurts from the side clean to my knee. Q. Can you step just straight forward? A. No, sir; I have to just sort of sling it around. Q. Is there any crook to your knee, and, if so, in what direction is it crooked? A. It is crooked backwards; causes me to have to walk on my heel. Q. Is there any motion in the joints of your knee? A. None whatever."

Recurring to the circumstances attending the accident and the theory of contributory negligence attributed to plaintiff by reason of his failure to see the set screw and to understand the danger which it threatened, it is conceded that it was his duty to replace the belt, and it is shown that, though an expert might sometimes have replaced a loose belt without going down upon the ground floor, the ordinary operator usually found it necessary to go down to the pulley; and it is also shown that the ground floor is, to say the least of it, very dimly lighted, and that the set screw projected but five-eighths or seven-eighths, of an inch from the collar

of a shaft which was underfoot, and was making several hundreds of revolutions per minute, and was not likely to have attracted his attention, or to have warned him of the danger threatened by it if he had known of its existence. On the other hand, that the foreman of the mill knew of the danger and failed either to provide against, or to warn plaintiff of, it is abundantly shown by his own testimony, which reads, in part, as follows:

"You had never called Mr. Braley's attention to this set screw? A. No, sir. * * * Q. You knew that set screw was there, and knew the dangerous condition of that place, didn't you? A. Yes, sir. Q. You had intended to cover it up, hadn't you? A. I don't know that I had. * * * Q. You did know that it was dangerous? A. Yes, sir. Q. You had intended to fix it up, but had neglected it up to this date? A. No, sir; I don't remember that. Q. Well, now, isn't it a fact that you had? I don't mean that you had said this to Dr. Browning, but that you had intended to fix it up and render it safe? A. I don't know that I had said anything about it; don't remember it. Q. How fast does that shaft revolve? A. About 360 revolutions a minute. Q. What was the size of the set screw? A. Five-eighths of an inch. Q. And it projected above the shaft how far? A. Five-eighths."

Dr. Browning was called, in rebuttal, to show that the witness had stated to him "that he knew that the place where Braley got hurt was dangerous, and that he had been intending to fix it," and the testimony was excluded, as not being rebutting evidence, a ruling which we think was erroneous. Elsewhere in his testimony the foreman says that the reason, and the only reason, why the set screw was not "covered up," and why "it wasn't protected," was that it was near (within 10 inches of) the "core gear," and that the "core gear" was so obviously dangerous that he assumed that it would operate as a "booger" or "scarecrow" and keep any one from going near it, and other witnesses give it as their opinion that a person thrown into contact with the "core gear" would be ground up, whereas he would only be cut in two by a circular saw;

from which it is deduced that it is more dangerous to get within ten inches of the one than the other.

### Opinion.

[1] The law applicable to the facts thus found is well settled to the effect that, when the employer knows the danger to which the employé will be subjected in the discharge of his employment (and though he may not, in fact, know it, the law will presume that he does), he is bound to provide against it, if reasonably possible, or else to warn the employé, unless the employé is already advised of it, or unless the danger is obvious to a person of ordinary intelligence and experience, under penalty of being liable in damages for the injury that the employé may sustain by reason of his (the employer's) failure to discharge those obligations. Myhan v. Electric Co., 41 La. Ann. 964, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436; Stucke v. Orleans R. Co., 50 La. Ann. 172, 23 South. 342; James v. Rapides L. Co., 50 La. Ann. 717, 23 South. 469, 44 L. R. A. 33; Carter v. Dubach L. Co., 113 La. 239, 36 South. 952; Smith v. Minden L. Co., 114 La. 1035, 38 South. 821; Whitworth v. South Ark. L. Co., 121 La. 895, 46 South. 912; White v. Nutriline M. Co., 133 La. 870, 63 South. 385; Gordon v. N. O. & G. N. R. Co., 135 La. 137, 64 South. 1014; Collins v. Krauss-Managan L. Co., 136 La. 303, 67 South. 12.

Conceding that defendant's machinery was of standard make and in good condition, and that the set screw was necessary and was properly placed, it was not in plain view, but was in a place obscurely lighted, upon a shaft that was revolving, when plaintiff had occasion to see it, at the rate of 360 revolutions per minute, from which it projected but, say, five-eighths of an inch, and it was not guarded at all; the proximity of the obviously dangerous "core gear" operating neither as a guard nor a warning with respect to the set screw to any one, and all the less, if possible, to one who was ignorant of the existence of the screw.

It is said that there were two other routes by which plaintiff might have reached his destination safer than that chosen by him; the one by way of the north end of the building, 140 feet going, and the same distance returning, making 280 feet, as against 64 feet (counting the length of the ladder) by the route chosen. But, according to the evidence, plaintiff had never taken or considered that route, and had no means of knowing whether it was safer or unsafer than the one which he had always taken, and the taking of which consumed much less of his employer's time. Moreover, the aperture was made in the main floor, and the ladder was placed there for the purpose, and the obvious purpose, of affording access to the ground floor to those who had occasion to go there, and who started from, or desired to reach, a point nearer to the aperture than to other entrances to that floor.

[2] The other route suggested runs from the foot of the ladder around a certain post, which supports the building, is less direct than the one taken, and requires the person taking it to "straddle" across a revolving shaft $2\frac{1}{2}$ feet, or (what the witnesses call) "straddle high." It is by no means clear to us that either of the routes would have been any safer than the one taken by plaintiff, and, in any event, it is a sufficient answer to defendant's contention that the route taken by plaintiff was the shortest and most obvious, and that no one had advised or instructed him, and that he did not know, that it was beset by any danger, save the "core gear," which he avoided, or that any other longer route would have been safer or better, for any reason. As to the amount of the award, we are of opinion that it should be increased, and this whether defendant be held liable merely for the injury which was

the direct and necessary consequence of the accident, or for such additional injury as may have been sustained by reason of the neglect (we will not say incompetence) with which he was treated at Dr. Dale's hospital. He was sent there at the instance of the manager of the mill, who charged the expense, as an act of humanity, to plaintiff's father, and we intend no reflection upon the manager. But, since plaintiff was injured through the fault of defendant, the obligation rested upon defendant to minimize, as well as repair, the damage resulting from the injury, and it is certainly not relieved of the obligation to repair, by reason of the fact that, through the negligence of the agent selected, its effort to minimize, though made in good faith, resulted in magnifying, the damage. It appears from the testimony of the manager that Dr. Dale was the regular surgeon of a railroad, or railroad company, which is referred to as one of the "Buchanan interests," and that the defendant company is another of those "interests," and it appears that Dr. Dale was not employed as the regular surgeon of the defendant. Nevertheless plaintiff was sent, by defendant's representative, to Dr. Dale's hospital, in order that he might get there on the night of November 15th, and be treated or operated on promptly, instead of being sent to the State Hospital at Shreveport, which he could have reached only on the following day, at 12:30 o'clock. But, as it turned out, his mangled leg was neither treated nor operated on until the evening of November 16th, though he had arrived at the Dale Hospital at 10 o'clock of the night preceding, which we consider gross and inexcusable neglect, such as neither Mr. Buchanan nor his mill manager, if injured as was the plaintiff, would have been likely to have met, and which may, in the absence of any other explanation, account for the subsequent badly infected condition of a wound sustained by a young man shown to

be sound and healthy. Again, it is shown to have been of the utmost importance, since, in the opinion of Dr. Dale, the knee was inevitably to be stiff, that it should be healed and grow stiff with a bend in the direction of the natural crook of the knee; but at the end of 12 or 14 days plaintiff was sent home with his leg, not only badly infected, but with the kneejoint so ankylosed that it curved, if anything, in the wrong direction, to the extent that it is rather a nuisance than a service, and he is obliged to walk on his heel, and is otherwise inconvenienced and disabled. We have frequently awarded $5,-000 and $6,000 for the loss of a leg, and we consider it rather poor compensation to any one sustaining such a loss, and particularly to a laboring man. Really adequate compensation in cases of this character is, however, impossible, and the established precedents furnish about as reasonable a rule as we have been able to discover. The award will accordingly be increased to $6,000. Bell v. Lumber Co., 107 La. 737, 31 South. 994; Budge v. Railroad Co., 108 La. 370, 32 South. 535, 58 L. R. A. 333; Williams v. Pickering Lumber Co., 125 La. 1087, 52 South. 167, 136 Am. St. Rep. 365, 19 Ann. Cas. 1224; Hebert v. Kingston Lumber Co., 126 La. 775, 52 South. 1021; Roby v. Railroad Co., 130 La. 895, 58 South. 700; White v. Nutriline Milling Co., 133 La. 870, 63 South. 385.

It is therefore ordered and decreed that the judgment appealed from be amended by increasing the amount thereby awarded from $4,000 to $6,000, and, as thus amended, affirmed, at the cost of the defendant.

### On Application for Rehearing.

PER CURIAM. It is said, in the opinion heretofore handed down, that:

"As to the amount of the award, we are of opinion that it should be increased, and this whether defendant be held liable merely for the injury which was the direct and necessary consequence of the accident, or for such additional

injury as may have been sustained by reason of the neglect (we will not say incompetence) with which he was treated at Dr. Dale's hospital."

In other words, we held that the inevitable disability, resulting directly from the accident entitled plaintiff to the increase allowed, and it is therefore immaterial whether defendant is or is not liable for such consequences as may have resulted from the manner in which his case was dealt with at the hospital to which he was sent by defendant's agent.

Rehearing refused.